In re CSI ENTERPRISES, INC., Energy Fuels, Ltd., Oren Lee Benton, Energy Fuels Exploration Co., Nuexco Trading Corp., Energy Fuels Mining Joint Venture, Debtor(s).

David J. BECKMAN, as Liquidating Trustee of the Benton and NTC Liquidating Trusts, not individually, but as successor in interest to the Official Joint Creditors' Committee of CSI Enterprises, Inc. and Other Jointly Administered Estates, Plaintiff,

v.

Chris I. VON CHRISTIERSON, Defendant and Third Party Plaintiff,

v.

Oren L. BENTON, Third Party Defendant.

Bankruptcy Nos. 95–11642 CEM, 95–11645 CEM, 95–11648 CEM, 95–11649 CEM, 95–11651 CEM, 96–19882 CEM. Adversary No. 97–1418 CEM.

United States Bankruptcy Court, D. Colorado.

May 19, 1998.

---

Bennett G. Young, Richard S. Shea, LeBoeuf, Lamb, Greene & MacRae, Denver, CO, for David J. Beckman.

D. Bruce Coles, Fish & Coles, Denver, CO, for Chris I. von Christierson.

Steven T. Mulligan, Mulligan & DePuy, Denver, CO, for Oren L. Benton.

## OPINION AND ORDER

CHARLES E. MATHESON, Chief Judge.

### I. INTRODUCTION

The Court has previously entered its order confirming a plan of reorganization for the Debtors in these procedurally consolidated proceedings. Pursuant to that plan, David Beckman, the plaintiff in the adversary proceeding now before the Court ("Beckman" or "Plaintiff"), assumed the office of the liquidating trustee whose role is to marshal and liquidate the assets of these estates. Included in Beckman's duties is the obligation to seek the recovery of prepetition transfers made by the Debtors which may be deemed voidable under the various recovery provisions of the Bankruptcy Code.

In this particular adversary proceeding, the Plaintiff seeks to recover the sum of $1,000,000 from the Defendant, Chris I. von Christierson ("von Christierson" or "Defendant"). The complaint alleged two claims for relief, each premised on the same payment to von Christierson. In the First Claim for Relief, the Plaintiff asserts that von Christierson received a transfer of $1,009,082.19 pursuant to a payment made to him on April 18, 1994. It is alleged that the transfer is avoidable pursuant to the provisions of 11 U.S.C. § 547 in that it was a transfer to an insider made within one year before the filing of this bankruptcy proceeding at a time when the Debtor, Oren Lee Benton ("Benton"), was insolvent, thereby enabling the Defendant to obtain a greater return on his debt than he would have obtained as an unsecured creditor in this estate.

The Second Claim for Relief is premised under 11 U.S.C. § 548. It asserts that the Debtor, Nuexco Trading Corp. ("NTC"), transferred the sum of $1,000,000 to Benton who then made the transfer to von Christierson. The position taken by Beckman on the Second Claim for Relief is that Benton received the funds as a mere conduit and that the transfer to the Defendant was, as a result, a transfer from NTC and not from Benton. In response to the Second Claim for Relief, von Christierson asserted a counterclaim against NTC. Further, he asserted a third party claim against Benton pursuant to 11 U.S.C. § 523(a)(3).

At the trial, the Court found that there was no evidence presented to support the claim that Benton received the $1,000,000 from NTC as a mere conduit. Accordingly, the Court dismissed both the Second Claim for Relief and the counterclaim asserted by von Christierson. The Court hereby incorporates in this opinion and order the findings made at the time of trial dismissing the Second Claim for Relief.

The primary issue before the Court on the First Claim for Relief concerns the question of whether Benton was insolvent on April 18, 1994, when the transfer of funds was made. Having reviewed the evidence presented, the Court concludes that the Plaintiff has failed in its burden of proving insolvency. Thus, the First Claim for Relief against the Defendant must also be dismissed. In addition, because von Christierson's third party claim against Benton was contingent on his having to disgorge the $1,000,000 transfer, the dismissal of the Plaintiff's complaint against von Christierson mandates, as well, that the third party complaint against Benton be dismissed.

### II. THE LAW

The element of section 547 that is in dispute is section 547(b)(4)(B), whether the transfer to von Christierson was made while Benton was insolvent. There is no dispute among the parties that the Defendant is an insider and that the transfer occurred outside the 90–day prepetition period. As such, the section 547(f) presumption of insolvency does not apply and the Plaintiff bears the burden of establishing Benton's insolvency on the date of the transfer, April 18, 1994. *Gillman v. Scientific Research Products Inc. of Delaware (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 554 (10th Cir.1995); 11 U.S.C. § 547(g). The Plaintiff must establish that by a preponderance of the evidence. *ABB Vecto Gray, Inc. v. First National Bank of Bethany Oklahoma (In re Robinson Brothers Drilling, Inc.)*, 9 F.3d 871, 874 (10th Cir.1993) citing 4 *Collier on Bankruptcy* ¶ 547.21[5] at 547–93 (15th ed.1993); *Inter-State National Bank of Kansas City v. Luther (Matter of Garden Grain & Seed Com-*

*pany, Inc.),* 221 F.2d 382, 390 (10th Cir. 1955); *Lawson v. Ford Motor Company (In re Roblin Industries, Inc.),* 78 F.3d 30, 34 (2nd Cir.1996).

The Code defines "insolvent" to mean, with respect to an entity, "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation. . . ." 11 U.S.C. § 101(32)(A). The House and Senate Reports from the Reform Act of 1978 explain that this definition of insolvency is "the traditional bankruptcy balance sheet test of insolvency." *Norton Bankruptcy Rules Pamphlet 1997–1998 Edition,* 51 citing H.R.Rep. No. 595, 95th Cong, 1st Sess 312 (1977); S.Rep. No. 989, 95th Cong, 2d Sess 25 (1978).

■ ·The concept of fair valuation embodied in this definition "contemplates a conversion of assets into cash during a reasonable period of time." *Travellers International AG v. Trans World Airlines, Inc. (In re Trans World Airlines Inc.),* 134 F.3d 188, 193 (3rd Cir.1998) (citations omitted). If a debtor is in such distress that it is no longer viable, however, it may not be appropriate to use a going concern value. Rather, liquidation value may more accurately reflect asset values. *In re Mama D'Angelo, Inc.,* 55 F.3d at 555. Otherwise, fair value is "determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts." *In re Roblin Industries, Inc.,* 78 F.3d at 35.

In the context of a going concern, what is a reasonable time is the subject of the Third Circuit's decision in *In re Trans World Airlines, Inc.,* 134 F.3d at 194–195. There the Third Circuit opined:

> We believe that the proper point of reference for determining a "reasonable" time period in the case of § 101(32)(A) should begin with the financial interests of the creditors. See *Syracuse Engineering Co.,* 110 F.2d at 471. The reasonable time should be an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its

claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price. *Cf. id.* This test satisfies the requirement of a fair valuation because it identifies, as best it can, the equilibrium point between the two competing concerns of creditors: the desire to maximize the dollar figure from the assets to be sold, and the desire to have the assets sold off quickly to satisfy creditors' claims sooner rather than later. *Id.* at 195.

■ The court may derive the values to be used from the appraisal testimony of experts but, as the Tenth Circuit has observed,

> the matrix within which questions of solvency and valuation exist in bankruptcy ·demands that there be no rigid approach taken to the subject. Because the value of property varies with time and circumstances, the finder of fact must be free to arrive at the "fair valuation" defined in section 101(26) by the most appropriate means. *Porter v. Yukon National Bank,* 866 F.2d 355, 357 (10th Cir.1989).

The Court must also consider the liability side of the balance sheet in the insolvency analysis and the range of issues which may be presented. For example, the Court may be called upon to consider whether particular notes are collectable or whether a contingent settlement of a debt should result in a reduction in the amount of the debt, *Porter v. Yukon National Bank,* 866 F.2d at 357, or whether publicly traded debt should be measured at face or market value or whether the costs of winding up a business should be considered a contingent liability. *In re Trans World Airlines,* 134 F.3d at 196.

■ Finally, the Plaintiff must prove insolvency on the date of the transfer.

> Insolvency on the date of preference is the critical issue, and insolvency on any other date is insufficient standing alone to prove this essential element of a preference. (Citations omitted). [E]vidence of insolvency on dates before and after preference dates is competent evidence of insolvency of those dates, especially when considered with evidence of continued decline toward bankruptcy. *Inter–State National Bank*

*of Kansas City v. Luther (Matter of Garden Grain & Seed Company, Inc.)*, 221 F.2d at 391. See also *In re Mama D'Angelo, Inc.*, 55 F.3d at 552, 554 (referred to there as "retrojection" and "projection" which provide for use of evidence of insolvency on a date before and after the preference date as competent evidence of the debtor's insolvency on the preference date).

## III. FACTUAL OVERVIEW

The history of events leading to the transactions culminating in this lawsuit have been set forth extensively in the disclosure statement that was prepared in connection with the confirmation of the plan of reorganization in these proceedings. In addition, the Plaintiff's Expert Report (Exhibit 48) also sets forth in a more summary fashion the general background of Benton's business affairs. While those recitations are helpful to an understanding of the issues presented in this case, it is not necessary for the Court to recite in detail all of that background. A brief summary, however, will be of assistance in understanding the framework in which this case was presented and the issues considered.

Benton's professional career started as an accountant. Thus, he brought to his business enterprises a well-grounded background in accounting. Eventually, he gave up the accounting practice to become engaged in the uranium business and, as such, became one of the foremost traders of uranium in the world. Benton eventually utilized a variety of entities to carry on the uranium business, including NTC and Nuexco Exchange AG ("NEAG"), all of which were referred to collectively as "NUEXCO." These entities were wholly owned and controlled by Benton. The uranium business flourished and generated substantial cash flows.

Benton entered into a certain investment and loan agreement ("ILA") with NUEXCO pursuant to which the cash flow being generated from the uranium companies was advanced to Benton to be used by him to invest on behalf of the corporate entities. He used those funds to invest in a dazzling array of other ventures, including such things as other uranium and gold mining operations, communication, microchip and other technology development companies, equestrian products, service companies, ranching and cattle raising, food processing equipment manufacturing, commercial banking and professional baseball. In addition, Benton owned large positions in the stock of several public companies including Ramtron International Corporation ("Ramtron"), Golden Shamrock Mines Limited ("Golden Shamrock Mines") and Rio Narcea Gold Mines ("Rio Narcea"). Benton personally owned these investments but he had a debt obligation to NUEXCO for the funds advanced to him pursuant to the ILA to make the investments.

In January 1991, Benton entered into an agreement with the Defendant to employ him, through Concord, one of Benton's entities. That agreement (Exhibit 1) provided that von Christierson was to have a "carried interest" in certain of the investments made by Benton. One of those carried interests ultimately turned out to be stock in a gold mining venture in Australia called Golden Shamrock Mines. That investment turned out to be enormously successful and the carried interest of the Defendant had a substantial value. The $1,009,082.19 payment made by Benton to von Christierson on April 18, 1994, was in partial satisfaction of the Defendant's carried interest in the Golden Shamrock Mines venture.

A variety of factors led to Benton and his entities experiencing significant cash flow problems resulting in the filing of a bankruptcy petition on behalf of these Debtors on February 23, 1995. The proceedings in bankruptcy were extremely complex, in part, because of the diverse makeup of Benton's assets and, in part, because of the diverse makeup of Benton's creditors. Despite that complexity, at a very early stage in the proceeding, it became generally apparent that the Benton empire was destined for liquidation and not reorganization as an ongoing business concern. A liquidating plan was ultimately approved. Mr. Beckman was appointed as the liquidating trustee and this litigation followed.

## IV. ANALYSIS OF INSOLVENCY ISSUE

**A.** *ASSET VALUATIONS.* The legal standard for determining whether Benton was insolvent on April 18, 1994, when the transfer was made, has been discussed above. The standard is simple to articulate. The Court is to determine the fair market value of the assets owned by Benton on that date.[1] That value is to reflect the amount that the assets could have been sold for, not in liquidation or distress sale, but an orderly sale conducted in a reasonable amount of time in an open market. The difficulty in the application of the rule belies its facial simplicity.

As the Court has observed, the range of commercial and financial interests owned by Benton was very wide. If Benton had been engaged in just one of these many enterprises, the Court might have expected the valuation testimony of that enterprise to have consumed several days of trial. What the Court heard, however, was a few hours of testimony presented by an "expert", Jeffrey Stegenga ("Stegenga") whose background and training is as an accountant. He does not hold any designations or credentials in the area of asset or business valuations. Stegenga, by his testimony and in his report, refers to a "value in use" of the various assets which, it appears, may or may not have any relationship to what the property or interests might be sold for in the market place. The cover letter to Stegenga's report, introduced as Exhibit 51, states that his services were performed "to assess the solvency of Benton and NTC based on accepted definitions related thereto and were not intended as a basis for a valuation or appraisal of Benton or NTC's assets by Price Waterhouse in accordance with recognized valuations standards." The resume of Stegenga's background and his testimony do not disclose a single instance in which he was engaged to determine the fair market value of any assets predicated on their realizable value in the marketplace.

The burden in this case is, of course, on the Plaintiff to establish that Benton was insolvent on April 18, 1994. Because this is an "insider" case, the Plaintiff does not have the benefit of the presumption of insolvency that would be available had the instant transfer been made within 90 days of the filing of the bankruptcy case. The Plaintiff would suggest that he has met the burden because the amount of debt outstanding is so great and the shortfall is so substantial that there is significant room for error in the valuation of the assets. The Court will, in due course, discuss the problems with respect to the analysis of the outstanding debt. As to the assets, it is sufficient for the Court to observe that the burden is on the Plaintiff to prove the value of the assets. That the Plaintiff has failed to do so can be established by examining the frailties of the valuation techniques used for certain of the specific assets.

1. *The Starting Point.* Stegenga started his analysis premised on the December 31, 1993 Financial Statement ("Financial Statement") of Benton. While Benton testified at trial that it is usual for an individual to carry assets owned by him at their value and not at cost, no one ever asked Benton the basis for the asset valuation used on his Financial Statement. He was not asked the question at trial and Stegenga never sought to interview Benton personally to inquire about the assets or the basis for their values. Thus, the Court has no idea whether the beginning values used by Stegenga were the fair market values for those assets within the meaning of the insolvency test.[2] Neither did any-

---

1. There is no evidence to indicate that a value other than fair market value should be used. There was no testimony that as of April 18, 1993, Benton was in such dire financial condition that liquidation values should be used.

2. The Financial Statement (Exhibit 56) indicates that the values presented were not, in every instance, meant to reflect the actual fair market value of each asset. For example, the balance sheet shows a value for Benton's ownership in NUEXCO and related companies of $50 million.

However, the footnotes to the financials state that the "value shown is conservative...." As to his interest in Professional Bank, it was valued at cost "which is not less than its realizable value." And, in a footnote dealing with tax obligations, it is disclosed that "the investment valuations are believed to be conservative." Thus, at least to Benton's belief, the actual fair market values of his assets as of December 31, 1993, may have been substantially higher.

one inquire of Benton whether the Financial Statement included all of his assets and all of his liabilities nor did anyone seek to establish the foundation of how it was put together in the first instance. Stegenga simply utilized the Financial Statement and adjusted values as he saw fit and as described in his report and his testimony.

2. *Golden Shamrock Mines.* The largest single investment owned by Benton on December 31, 1993, was his interest in Golden Shamrock Mines, an Australian gold mining venture the shares of which were publicly traded. Benton owned stock in the company, options to purchase more stock, and debt instruments that were convertible into stock. This was one of the ventures that was subject to the Defendant's 20% carried interest. Benton placed a value of $105 million on this investment as of December 31, 1993.

In 1993, the Defendant had approached Benton seeking to take separate control over the Defendant's carried interest in the Golden Shamrock Mines investment. Ultimately, Benton and the Defendant reached an agreement that led to Benton exercising the options he held and selling shares he owned.

Stegenga's report states that, as of December 31, 1993, Benton owned 62,478,682 shares of stock. Exhibit 6 to the report then sets forth an analysis by Stegenga of the value of Benton's stock ownership at December 31, 1993, which was $70,200,000 (based on a stock price of $1.20/share and an exchange rate of $0.6793 U.S. to the Australian dollar—or, a market price per share, in U.S. dollars of $0.81.) Exhibit 12 to the report then carries the calculation forward to April 18, 1994, based on actual transactions made by Benton in 1994, resulting in a value for Benton's Golden Shamrock Mines interests (represented by the net cash proceeds) of $69,900,000.

The process used by Stegenga is an acceptable arithmetical system to show the value for 62,478,682 shares of stock (plus the option shares). The problem is that there is absolutely no foundation for the conclusion that this represented all of the shares owned by Benton. Neither is there any foundation for the suggestion that Benton sold all of his Golden Shamrock Mines shares in the spring of 1994. In fact, other evidence presented by the Plaintiff negates any such conclusion.

During the course of negotiations between Benton and the Defendant, there was a series of memoranda that were exchanged. These memos were received in evidence as Exhibits 8 through 15. Exhibit 10 recaps the ownership interests of Benton and the Defendant and indicates that Benton owned (or would own upon exercise of all options and conversion rights) 123,794,727 shares. At $0.81/share U.S., the total is $100,273,730, a figure relatively close to Benton's value of $105 million.

It is, of course, possible that after July 1993 (the date of Exhibit 10), Benton sold some shares. Anything is possible. The point, however, is that there is no evidence to support the starting figure of 62,478,682 shares relied on by Stegenga in his report.

The Court recognizes the general proposition that an expert can utilize a variety of sources in framing an opinion. But, ultimately, there must be some competent evidence to establish (1) how many shares Benton owned, and (2) that the expert valued those shares. If the issue in the case is the value of the debtor's 1994 Ford Taurus, an expert's opinion of the value of "a" 1994 Ford Taurus is of no moment if there is no evidence to establish that the Ford Taurus he valued is the Ford Taurus the debtor owned. Here, there is no such evidence and the flaw is fatal. The expert's testimony cannot be used as proof of the number of shares of stock that Benton owned. *Matter of James Wilson Associates,* 965 F.2d 160, 173 (7th Cir.1992); *Gong v. Hirsch,* 913 F.2d 1269, 1272 (7th Cir.1990).

3. *Uranium Trading Accounts.* NTC held a large portfolio of contracts to buy and sell uranium. Benton testified that at the time the bankruptcy was filed he, through his entities, was holding contracts receivable for future sales of uranium of more than one billion dollars.

No attempt was made by the Plaintiff to seek to set a value for this portfolio of contracts on a going concern basis or if offered for sale in the market place. Instead, what was utilized was the accounting expedient of

determining the value of these contracts on a "spot basis" price. In other words, the accountant struck the market price of uranium on April 18, 1994, and assumed that all of the contracts held by NTC would be performed at that market price. That valuation technique resulted in the determination that these contracts in the aggregate had a negative value. That is, the future contracts for sale were at prices below what it would cost Benton to deliver the uranium based on a spot price of uranium on April 18, 1994.

Stegenga's testimony was that the spot price of uranium itself was effectively not a highly reliable figure. In fact, he acknowledged that Benton as a trader was such a dominant force in the market that he effectively set the spot price for uranium. The other problem is that using the spot price on April 18, 1994, gave no experienced professional judgment to the future of the uranium market. Neither does it take into consideration the fact that the contracts might be of value to another entity which itself was a producer of uranium and could fulfill the contracts out of its own supply, an alternative that indeed was potentially available to Benton.

Using the spot price technique does give a value, but it is not evidence of the kind of value for which the Court must search in determining whether Benton was insolvent. It is only an accounting expedient.

The problems concerning the valuation of the trading accounts are compounded by the lack of any foundation for the starting point for Stegenga's analysis, similar to the problems of the Golden Shamrock Mines valuation. As to NTC, he testified that he started with the unaudited December 31, 1993 Financial Statement for the company. However, he did not know who had prepared the Financial Statement. It was simply his "expectation" that the amount reflected was "probably relatively accurate."

4. *The CMA Interests.* Among the assets owned by Benton was Concord Minera Austuriana ("CMA"). CMA was an entity engaged in the exploration and development of gold deposits in Spain. It was engaged in a participation in an exploration joint venture with Rio Narcea. What Stegenga was seeking to value was Benton's interest in a non-producing gold exploration company.

In this Court's experience valuing a natural resources company, be it a gold mining operation, coal mining, oil and gas or other mineral interest, starts with the testimony of an expert who can testify concerning the available mineral reserves. Once the reserves can be estimated, there must be some estimation of the time it will take to extract the reserves, the percentage of recovery that can be expected and the net recoverable ores that can be realized. Those must then be priced based on an expert's evaluation of future values of those mineral recoveries and those values must be in turn reduced to a present value based on the testimony of someone knowledgeable about economic returns. None of this was presented.

Stegenga, in his report, testifies that he considered the estimated gold reserves at December 31, 1993, for Rio Narcea along with relevant historical gold reserve acquisition prices. He refers to the Blackstone Report on which he relied as showing a predictable estimated level of reserves. He then utilized historical acquisition prices of gold reserves to arrive at a market transaction valuation for Rio Narcea and a valuation of Benton's interest in Rio Narcea at a net of $21.9 million.

Once again, what is lacking is any foundation for the evidence elicited from Stegenga concerning the amount of the reserves owned by the company. The Blackstone Report is not in evidence before this Court and the Court has absolutely no idea how it was prepared, from whom Blackstone obtained its information or how it came to estimate the available reserves. Neither is there any foundation from anyone to establish the correlation between historical acquisition prices for gold reserves and market transaction values as of and after December 31, 1993. The reality is that the $21.9 million figure is just that—it is a figure, an accounting expedient. It has some historical meaning if one has any basis to place any credibility in the Blackstone Report. As presented, it is a figure that is meaningless to this Court. Thus, the Court is without any meaningful information

concerning the fair market value of the CMA interests.

5. *Energy Fuels.* Energy Fuels was a corporation owned by Benton that was engaged in uranium mining in the Western United States. The company was sold to a third party during the course of the bankruptcy proceedings for $20,425,000. Stegenga accepted this price as representing the value of Energy Fuels as of December 31, 1993, after adjustment for an allocation of $5 million to certain assets which were not acquired by Energy Fuels until late in 1994.

No effort was made by Stegenga to determine the value of Energy Fuels based on its available reserve deposits. No consideration was given to the possible difference in uranium prices at December 31, 1993, April 18, 1994 or in 1997 when the company was sold. Prices realized for the sale of assets by a debtor in bankruptcy seldom, if ever, bear any relationship to the true market value of the property, a fact that was recognized by Benton in his testimony. The reliability of this valuation is further impaired by the reality that the sale occurred more than three years after the date for which the Court seeks the valuation of Energy Fuels. The same problem impairs Stegenga's valuation for other assets such as Partrade and OCI.

6. *Concord Trading Company.* Concord Trading Company ("CTC") was involved in the trading of non-nuclear fuels. Stegenga in his report notes the limited availability of financial information and the fact that CTC had total book losses of approximately $10 million for the three year period through 1993. Without any consideration for the actual assets or the potential market values, and in the face of such limited information, Stegenga arbitrarily valued CTC at its approximate liquidation value based on its December 31, 1993 balance sheet. This valuation simply does not comport with the standards that this Court is required to utilize in determining whether Benton was insolvent.

7. *Ramtron International Corporation.* Ramtron is a publicly traded company that has been involved in the research and production of new technological devices. Benton owned a substantial block of stock of Ramtron as well as options to acquire additional shares of stock.

Stegenga valued Ramtron based on the market value of the shares on April 18, 1994. He valued both Benton's share holdings and the share options held by Benton. He then discounted that aggregate market price by "x" percent to reflect what he considered to be the relative nonliquidity of the investment.

The evidence is that the Ramtron stock in the market place has been extremely volatile. It has ranged in price from approximately $2 to in excess of $14 per share. The block of stock owned by Benton is sufficient to give him effective control of the company, although it is less than 51%. As noted, Stegenga discounted the value of the stock finding that the large stockholding tended to diminish the ability of Benton to liquidate his share interest without depressing the market. Benton, for his part, testified that he believed that the controlling interest in the company could be sold for a premium.

Determining the value of the Ramtron stock on April 18, 1994, is like the spot value of the uranium contracts—an accounting expedient. Everyone acknowledged that the shares could not be placed in the market on that date and sold for that amount. Liquidating the Ramtron shares would take time and a controlled sale. It may also take the searching out of a company or individuals who would have an interest in acquiring control of the devices being developed by Ramtron. In order to arrive at a fair valuation of these interests, consideration had to be given to the fluctuation in stock prices, at least within some reasonable period of time after April 18, 1994. The size of Benton's interest in Ramtron is large enough that an increase in value from that stated on April 18, 1994, to the $14 level could have a profound and significant impact on the valuation analysis.

8. *Coldwell Bankers Professionals Inc.* Coldwell Bankers Professionals Inc. ("CBPI") owned all of the Coldwell Bankers franchises in Denver, Evergreen and Winter Park, Colorado. Stegenga testified that from 1991 through 1993, CBPI had a book net loss of approximately $6 million and had negative book net worth of $10–$22 million.

He further stated that in 1994, two offers were made by third parties to acquire CBPI, both of which were limited to the assumption of liabilities of CBPI as total consideration. Therefore, Stegenga concluded that the value of CBPI as of December 31, 1993 was zero.

Stegenga made no effort to evaluate for the Court the nature of the assets owned by CBPI. The fact that the company operated at a loss for a period of time is not at all an indication of the potential value of the company. Offers to purchase have never been viewed as being indicative of value. Thus, the Court has no reliable estimate of the value of this asset.

9. *"Investments in Businesses"*. On his Financial Statement Benton scheduled as an asset an item designated as "Investments in Businesses" valued at $90 million. The attached schedule shows that this item was made up of three asset categories, to wit:

| | |
|---|---|
| NUEXCO and related companies | $50,000,000 |
| Colorado Baseball | 25,000,000 |
| Professional Bank | 15,000,000 |

In doing his solvency test, Stegenga made no effort to examine the assets included in the $50 million valuation for NUEXCO and related companies. Instead, he did a solvency test for Benton in which he assumed the validity of the $50 million valuation, but adjusted and reduced the values of the various other investments. Having done so, he concluded that Benton was insolvent. In his view, the solvency of NTC depended on the ability of Benton to pay his payable balance to NTC arising out of the ILA. Since Benton was considered to be insolvent and, therefore, unable to pay his note in full, Stegenga concluded that the $50 million attributed value of NUEXCO and related companies had to be written off.

The process used by Stegenga appears to ignore the potential values of entities other than NTC that were included in the assets making up the $50 million figure. In particular, there is no indication of whether Stegenga attempted to value Benton's ownership of NEAG, which should have included NEAG's 49 percent interest in GNSS which was a uranium joint venture with Russia. In March 1995, Benton valued the stock in GNSS at a liquidation price of $15 million

versus a price of up to $50 million that might be achieved in a year's time.

The reality is that Stegenga's valuation of NTC was wholly driven by his assumed write down of the so-called NTC investments and debt adjustments. However, the Benton financials state that the $50 million value was "conservative." Thus, it might have been significantly more than $50 million. This was not considered by Stegenga.

10. *"Other."* Benton's Financial Statement contained a catchall provision for "Other" investments which he valued at $10 million. Stegenga had no information available to explain the nature or value of those and, therefore, accepted the $10 million figure. However, once again, the Court is left with an insufficient foundation to identify the nature of those assets and the reason for the valuation as established by the Financial Statement. Mr. Benton spent a significant amount of time on the witness stand during the trial in this case and the Plaintiff never attempted to elicit that information. Thus, the Court is left with the conclusion that there were other assets owned by Benton for which Stegenga has made no accounting nor has he attempted to value them.

B. *LIABILITIES.* In order to determine whether Benton was solvent or insolvent on April 18, 1994, the Court must consider both the value of the assets owned by Benton and the amount of the debt that was owed by him. Thus, the resolution of this issue called for some relevant and reliable evidence concerning the amount of the outstanding liabilities on the critical date. The Plaintiff's evidence on this issue is as ephemeral as the evidence of values.

It is instructive to again look to Stegenga's report. He advises that for his analysis he used financial and other information obtained from public sources which have been represented as and which he believed to be reliable. His conclusions are dependent on such information being complete and accurate in all material respects. He did not conduct an audit of the information and advises that he expresses "no opinion or any other form of assurance on such information."

As with the asset side of the analysis, for the liability side Stegenga started with Benton's Financial Statement. Once again it must be noted that Stegenga never inquired of Benton or his employees who were familiar with his financial affairs and there is no evidence before the Court to validate the information contained in that Financial Statement.

Benton's Financial Statement contained an offsetting item pertaining to NTC. He showed as an asset the investments he had made on behalf of NTC at a total valuation of $407 million. The Financial Statement contained an offsetting liability representing the promissory note obligation in the amount of $405 million from Benton to NTC evidencing the advance of funds pursuant to the ILA which was used to acquire the various investments. In preparing his report, Stegenga also reviewed draft financial statements of NTC for December 31, 1993. Those financial statements reported the indebtedness owed by Benton to equal $427,186,000. Stegenga reports that the financial statements of NTC were deemed to be more reliable and, as such, the balance he assigned to the NTC note was $427,186,000.

The Court has been offered no explanation as to why Stegenga considered the NTC financial statements to be more reliable. The NTC financial statements have not been introduced. And, as the Court earlier noted, Stegenga does not even know who prepared the particular financial statement or where it came from. Again, while it is appropriate for an expert to testify and formulate his opinion based on hearsay evidence, in this case the Court is being asked to accept Stegenga's hearsay testimony and his value judgment as evidence of the ultimate fact and in lieu of any proof of the actual indebtedness owed by Benton to NTC. On the other hand, Stegenga has testified that he started from Benton's Financial Statement because he believed that it was probably accurate. There is no reason whatsoever for the Court to accept Stegenga's evaluation as to the amount of the debt. Clearly, it is not an opinion formulated by him after an audit or any search for the truth of the actual amount of the indebtedness. An expert's testimony cannot be used to subvert the rules of evidence. *Matter of James Wilson Associates*, 965 F.2d at 173.

Similar problems arise with respect to an adjustment made by Stegenga to the balance sheet for a $30 million asserted indebtedness to the entity referred to as CCFL. Stegenga's report on page 12 describes the transactions pursuant to which Benton became obligated to CCFL in the amount of $30 million represented by certain formal promissory notes. However, these notes were not reflected on Benton's personal balance sheet as of December 31, 1993. Stegenga reports that he was unable to find any documentation to show that such obligations were not still outstanding. He found other assignment and amendment activity subsequently to December 31, 1993, implying the continued existence of this debt and testified that a trial balance of CCFL as of December 31, 1993, reflects these outstanding obligations.

Once again, the problem is that the Court is asked to accept Stegenga's evaluation. The testimony is wholly hearsay, is not backed up by the underlying financial documents and is presented by Stegenga without any attempt to determine the reliability of the December 31, 1993 Benton Financial Statement by talking to Benton or anyone else in Benton's organization.

The tax liability reflects another problem. After the bankruptcy case was filed, the Internal Revenue Service ("IRS") asserted a claim against Benton for approximately $267 million for unpaid taxes for the years 1990 through 1993. Ultimately, this claim with the IRS was settled for $22 million. Stegenga concludes that "accordingly, Benton's actual liability owed to the IRS for unpaid taxes, interest and penalties at December 31, 1993, is between $22 million and $267 million."

The Court finds it difficult to accept Stegenga's evaluation. The tax claim in the Benton estate presented a monumental problem in the reorganization. Because it was a priority claim, the tax claim, if allowed, would have absorbed a very significant percentage of the estate's assets. Further, there was the very realistic fact that litigating the tax claim would have meant that any possible distribution to the creditors would have to be

deferred for years as the litigation moved through the U.S. Bankruptcy Court to the U.S. District Court to the 10th Circuit Court of Appeals and, perhaps, back again. Then, of course, there was the actual cost to the estate of engaging in such litigation which itself was going to run into the many millions of dollars. Thus, there were a variety of factors driving the parties on both sides to the resolution of this claim by way of settlement. The Court cannot conclude that just because the parties settled the tax liability at $22 million that the figure is in any way evidence of what the actual liability might have been at December 31, 1993. The Court received no testimony from anyone to attempt to quantify the amount of the tax liability.

Stegenga has testified that he had attempted to develop the financial statement on insolvency on a conservative basis. The Court recognizes that it is entirely possible that the presentation of real evidence concerning the outstanding liabilities of Benton at December 31, 1993, might conceivably establish that the indebtedness was significantly higher than that carried by Benton on his financial statement. The Court cannot discount the possibility that it might also turn out to be substantially lower. The fact is that from the evidence presented the Court cannot determine the amount of the debt that was outstanding.

### V. SOLVENCY ANALYSIS

Benton testified that he believed that he was solvent on December 31, 1993, on April 18, 1994 and when he filed bankruptcy on February 23, 1995. His December 31, 1993 balance sheet, as he presented it (carrying the NTC note at $405 million) indicated that Benton had a positive net worth of some $52 million.

The Plaintiff's insolvency valuation is really driven by the inclusion in the balance sheet of approximately $75 million of additional debt represented by the increase in the amount of the NTC note, the $30 million CCFL loan and the $22 million attributed to the unpaid tax claim. There is no competent evidence before the Court to establish the existence, let alone the precise amount, of

this debt. *Matter of James Wilson Associates,* 965 F.2d at 173. On the other side of the balance sheet, the assets were decreased by some $216 million represented by a writeoff of the $50 million investment in NUEXCO and the write-down of the NTC investments by $166 million.

The Court is unable to conclude that the Plaintiff has sustained his burden of presenting evidence to justify the write down of the assets to the extent asserted. For the reasons outlined above, the Court does not believe that the valuation approach used by Stegenga comports with the standards the law demands. If the asset values are not reduced, then the aggregate assets at December 31, 1993, are worth at least $497,740,-000. Stegenga testified to an additional $7,800,000 reduction in value as of April 18, 1994. However, that reduction in value is attributable to Stegenga's assumption that Benton was insolvent which then had the effect of reducing Benton's ability to repay his note to NTC which further reduced the value of NTC. The Court's analysis indicates, however, that Benton was not insolvent on December 31, 1993. Without the various write downs, he then had assets having a value of at least $497,740,000. If the NTC note has a balance of $405 million as shown on the Benton financial statement, then his aggregate debt, even including the questionable CCFL loan and the $22 million estimated tax liability, was $497,300,000 leading to the conclusion that Benton was solvent.

The margin of solvency is slim, but it is the Plaintiff's burden to prove insolvency. There are various facts that could affect the analysis, either plus or minus. However, it is sufficient at this point for the Court to conclude that it is not persuaded by the Plaintiff's evidence that Benton was insolvent on April 18, 1994, when the transfer was made. Therefore, judgment must enter for the Defendant herein.

IT IS SO ORDERED.