## In re MINISCRIBE CORPORATION, a Delaware corporation, Debtor.

### Tom H. Connolly, Chapter 7 Trustee, Claimant,

v.

### Harris Trust Company of California, Indenture Trustee, and the United States Trustee, Respondent.

### No. 90 B 00001 E.

United States Bankruptcy Court, D. Colorado.

Nov. 16, 2000.

See also 43 F.3d 474.

58

Glen E. Keller, Jr., Denver, CO, for debtor.

Phillip D. Barber, Douglas W. Jessop, Gregory L. Williams, Denver, CO, for Tom H. Connolly.

## OPINION AND ORDER ON FEE APPLICATION

CHARLES E. MATHESON, Bankruptcy Judge.

Once again before the Court is the question of the fee that should properly be allowed to the Trustee for his services in this Chapter 7 case. This Court previously heard extensive testimony and entered its order allowing the Trustee a fee of $3,044,953.69. That opinion and order can be found at *In re MiniScribe Corp.,* 241 B.R. 729 (Bankr.D.Colo.1999). The facts and background that pertain to this case are fully set forth in that opinion and are incorporated herein by reference.

Harris Trust, in its role as Indenture Trustee, opposed the allowance of the fee sought by the Trustee in this case and appealed this Court's order. The district court has now entered its opinion and order reversing this Court's fee allowance and remanding the matter for further proceedings.

In its earlier opinion this Court utilized two alternative approaches in evaluating the fee that might properly be allowed. One approach was the so-called "common fund" approach. The other was the traditional "lodestar" analysis.

Using the common fund approach, and the percentage of recovery that was approved by the Tenth Circuit in the parallel shareholder class action proceedings (*see, Gottlieb v. Barry,* 43 F.3d 474 (10th Cir. 1994) (hereafter *"Gottlieb"*)), the Court concluded that the total administrative costs in this Chapter 7 estate could be something in excess of $23,000,000 (based on 22.5% of a $101 million estate). By comparison, the total administrative costs for this estate, based on a fee to the Trustee of $3,044,953, would be less than $11 million, or approximately 10.7% of the bankruptcy estate.

In using the lodestar analysis the Court chose to allow the Trustee an hourly rate of $500 for his services. Then, considering the factors identified in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), as adopted in *Ramos v. Lamm,* 713 F.2d 546, 557 (10th Cir.1983), the Court applied a multiple of 3.5. That approach resulted in a fee of $3,113,250.

The Trustee's fees in this case are subject to the cap mandated in 11 U.S.C. § 326. The maximum fee allowable under that cap is the amount allowed as a fee to the Trustee, to wit, $3,044,953.69.

The district court has rejected this Court's reasoning and has remanded the matter to this Court for further consideration. In its opinion and order the court made the following points:

1. The use of the common fund approach, in the manner in which it was done by this Court, was clear error.

2. This Court's finding that a $500/hour rate would not be unreasonable was not supported by the record.

3. In picking a multiplier of 3.5 to adjust the lodestar, this Court failed to consider or give proper weight to, or erroneously considered, a variety of factors. Specifically, the district court took issue with this Court's use of the $101.5 million figure as the measure of the results achieved by the Trustee and the district court believed that this Court erroneously concluded that the Trustee in this

case had been subject to any real risk as to the payment or non-payment of his fee.

After remand this Court convened further hearings to give the parties the opportunity to present their arguments on the issues presented by the order of remand.[1] Not surprisingly, the conclusions of the parties remain as they were at the close of the evidentiary hearings. The Trustee asserts that his fee should be exactly as it was awarded by this Court. Harris asserts that the proper fee is in the range of $555,800 to $819,700. Neither offered any assistance to this Court in addressing the question of the size of estate that can properly be attributed to the Trustee's efforts, something that the district court has directed is larger than $31.5 million but smaller than the $101.5 million that this Court has determined is the size of the bankruptcy estate for purposes of section 326 of the Code.

It is difficult to come to grips with the issue posed by the district court concerning the measure of the results achieved by the Trustee, or to quantify that figure. The gross estate was $101.5 million. Of that, in round figures, $17 million was recovered by the Trustee in the various recovery actions and should properly be considered to be part of the results achieved by the Trustee. The balance relates to the settlement fund. Out of that fund, $4.1 million was disbursed to the "non-signing Plaintiffs." The amount paid out to the non-signing Plaintiffs ought not be considered as part of the results achieved herein by the Trustee, although it is included in calculating the "cap" on the Trustee's compensation under section 326 of the Code.

The apparent concern of the district court is that it was not only the Trustee that contributed to the settlement that was achieved in the fraud litigation. Contribution was also made by separate counsel for Standard Chartered Bank ("SCB") and ELLCO, as well as by all of the attorneys representing the plaintiffs in the parallel shareholder class action suits and by the efforts of the magistrate judge who nurtured the settlement negotiations.

The concerns of the district court about fees related to the MiniScribe fraud litigation are not new. They were previously expressed by that court in *Gottlieb v. Wiles*, 150 F.R.D. 174 (D.Colo.1993) (hereafter *"Wiles"*), *rev'd*, *Gottlieb*, when the district court rejected the common fund approach in allowing fees to class counsel in the MiniScribe class action litigation. There the court said:

> The settlement was facilitated by the efforts of Magistrate Judge Bruce D. Pringle in settlement conferences. Counsel for the plaintiffs in all of the cases in the global agreement were participants in the negotiations and settlement process as, of course, were counsel for the settling defendants. The pendency of the other coordinated cases and the efforts of the lawyers representing those other plaintiffs contributed significantly to the resolution of this action. There is no way to measure the contribution of class counsel relative to the other lawyers in achieving the global settlement. It is simplistic to say that a settlement fund of $44,000,000 was created through the efforts of class counsel. *Wiles*, 150 F.R.D. at 178.

This Court concludes that a reasonable, if imperfect, approach to evaluate the Trustee's contribution is to reduce the size of the settlement fund (net after distribution to the non-signing plaintiffs) by the pro rata share of that fund that would have been allocable to the "senior debt" in the absence of any inter-creditor settlement agreement. That amount can be determined as a percentage of the total debt, as finally allowed, without reduction for the claims of SCB and ELLCO. This is:

| | |
|---|---|
| SCB | 65.5 million |
| ELLCO (senior) | .5 million |
| ELLCO (unsecured) | 6.0 million |
| Other unsecured | 8.4 million |
| Debentures | 97.5 million |
| Total | $177.9 million |

---

1. This Court declined the request of the Trustee to present new and additional evidence.

The percent, then, allocable to Senior Debt is 66/177.9, or 37%. Thus, 63% of the settlement fund of $80 million, or $50.4 million, is fairly allocable to the efforts of the Trustee, plus the $17 million recovered in the various other actions, or a total of $ 67.4 million. The Court finds that this is a fair measure of the contribution made to this estate by the Trustee's efforts.

In ruling that this Court had improperly applied the common fund approach as one measure for compensation in this case it appears that the district court was once again voicing the concerns previously voiced by it in *Gottlieb*, that being that the efforts of other counsel and, indeed, the magistrate judge all contributed to the results achieved. The reduction in the portion of the settlement fund attributable to the Trustee to the $50.4 million figure should alleviate that concern and should act to more fairly measure the Trustee's contribution to this estate.

The other factor pointed to by the district court was a concern that the subordinated debenture holders are being asked to "unfairly" bear a disproportionate share of the administrative costs in this bankruptcy estate. If this concern is related to the size of the recovery attributable to the efforts of the Trustee, the reduction already made should speak to that concern. As to the "unfair" allocation, if it is unfair, that unfairness arises out of the agreement made by the debenture holders by reason of the subordination agreement.

It is instructive for the Court to examine the allocation in this estate of the administrative expense burden in the absence of the distribution agreement and the settlement agreement that was entered into as a part of the resolution of the Trustee's fraud case.[2] Again, the total debt would be as described above, to wit, $177.9 million. In making distributions out of the estate there would first be paid the costs of administration (whatever they are.)

The balance would be allocated pro rata among the creditor classes, i.e.:

| | | |
|---|---|---|
| Senior Debt (SCB and ELLCO) | $66.0 million | = 37% |
| General unsecured (including the Balance of ELLCO) | 14.4 million | = 8% |
| Subordinated debentures | 97.5 million | = 54% |

Because the total estate available for distribution, regardless of the amount allocable pro rata for administrative expenses, was less than the total amount of the debt, the Senior Debt was not going to get paid in full out of the estate. Neither, or course, were the general unsecured creditors nor the debentures. But, the Senior Debt had another fund to look to, and that was the money allocable to the "subordinated" debentures. That contractual pay up meant that Senior Debt stood to get paid in full and would, effectively, not bear any of the administrative expense of the estate. That administrative burden would be borne, in part, by the general unsecured creditors (who would not get paid in full out of the estate) and by the debenture holders. And, that was the agreement made by the subordinated debentures. Unfair? Perhaps. But for that risk they were presumably compensated by the 7 1/2% rate of interest they stood to earn had bankruptcy not intervened, plus the potential upside afforded by the conversion rights that attached to the debentures.

As it happened, this distribution scheme did not occur. Instead, the Distribution Agreement was made. Pursuant to that agreement, SCB and ELLCO agreed to reduce the size of their claims, and those dollars effectively dropped immediately into the pockets of the debenture holders.

At the time the Distribution Agreement was struck, the total unsecured claims were in a staggering amount. The best estimate was that those claims, separate from ELLCO's unsecured claim, would end up at approximately $24 million. Out of the settlement fund, $8 million was allocated to this class in the belief that this

---

2. These agreements, and the nature of the settlement, are fully discussed in the Court's prior opinion at 241 B.R. at 743–746.

would be a partial payment on those claims. Ultimately, however, largely due to the diligence of the Trustee in pursuing claim objections, this class ended up at $8.4 million of allowed claims and was paid in full. Thus, due to the Distribution Agreement, the Senior debt effectively shared in the administrative costs by virtue of their agreed reduction in their claims by $6.5 million. However, the general unsecured creditors emerged unscathed.

The result achieved by the Distribution Agreement was unintended and unforeseen. But it was everyone's best effort and was not objected to by Harris. And, the reality is that, due to the reduction in the claims of SCB and ELLCO, the Distribution Agreement had little real impact on what was paid out to the debenture holders.

If the common fund analysis approved by the Circuit in *Gottlieb* is applied to the $67.4 million estate realized by the efforts of the Trustee, the result would be a total administrative burden in this estate (at 22.5%) of $15.2 million. As previously found by this Court, the total comparative administrative burden in this case, assuming the Trustee is awarded a fee of $3.04 million, would be $10.86 million, which is, of course, less than the administrative burden found to be reasonable by the Circuit in *Gottlieb*.

As to the hourly rate of $500 used by this Court in its lodestar analysis, the district court is correct that there is no direct support for this figure in the record. This Court has previously analyzed, and rejected, the so-called "expert" opinions that were proffered as to hourly rates. *In re MiniScribe Corp.*, 241 B.R. at 740–743. That analysis was not found to be erroneous by the district court.

The threshold problem with the evidence that is in the record concerning hourly rates is that it all pertains to the hourly rates charged by attorneys. But, as previously observed, Mr. Connolly, in this case, was *not* acting as an attorney.

He was acting as the case fiduciary. As this Court observed:

> The Court here is not evaluating the skill required of the attorney, but of the Trustee, the fiduciary in the case. The Trustee had to bring to his position the skills of a consummate negotiator, one who could converse with conviction and credibility with both sides. He had to be inventive, able to evaluate the litigation risks and costs, the fairness to the creditors, the prospects for collection, etc. In short, he had to bring with him the skill of the chief executive officer. To him fell the burden of the final decisions. On him was the risk of pushing the defendants too far, or leaving too much on the table. These are skills learned after years of experience, and it was clear from the testimony of those who were involved with the Trustee in the litigation that he brought these skills to the table, and they were recognized and appreciated. *In re MiniScribe Corp.*, 241 B.R. at 750.

*See also Kennedy v. Rams Hill, LLC (In re Borrego Springs Development Corp.)*, 253 B.R. 271 (S.D.Cal.2000) (recognizing that the role of the Trustee is different from that of the attorney and may be compensated differently).

■ Mr. Seawell, the expert for Harris, testified that, in his opinion, the hourly rates charged by attorneys in 1991–92 was in the range of $100 to $250. But the Circuit has recognized that, as partial compensation to an attorney for the delay in payment that occurs in cases such as this, it is appropriate to consider the hourly rates in existence at the time the fee award is made, and not as of the time the work was performed. *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983). There is no reliable evidence in the record of these rates. The Trustee acknowledged that, while employed with the Gibson Dunn firm, he had billed at the rate of $330/hour, but stated that in providing services as Trustee he had not charged an hourly rate

but instead had applied the percentage allowed under section 326 of the Code.[3]

The Trustee's witnesses did not provide any evidence concerning hourly rates. Instead, their testimony was to the effect that trustees are not, and should not be, compensated on a lodestar basis, but instead on a percentage of the fund basis. That evidence was flawed and, in any event, the witnesses did not present any evidence concerning *what* rate would be applicable other than application of the maximum allowed under section 326 of the Code. However, it is the law of this case that the percentages specified in 326 are only maximums, and that the amount of the "reasonable" fee to be allowed must be determined under section 330.

■ In the absence of meaningful and reliable evidence, the Court is entitled to apply its own knowledge of fees generally charged in these kinds of proceedings. *Lucero v. Trinidad,* 815 F.2d 1384 (10th Cir.1987)("Absent other evidence of prevailing market rates the district court must rely on all relevant factors known to the court in establishing the reasonable rate to be applied in multiplying the number of hours by the hourly rate to derive the "lodestar" figure." *Id.* at 1385.); *Bee v. Greaves,* 910 F.2d 686 (10th Cir.1990). The files of proceedings in this Court reflect a vast range of hourly rates that are charged by local attorneys. Those rates can vary from a low of $100 or less, to an upper level in the range of $350. That is for local attorneys. Lawyers from other locales, appearing before this Court, frequently charge fees in the $450 range.

Those are the rates for attorneys. For other kinds of "professionals" hired under section 327 of the Code, and subject to the fee allowance requirements of section 330, there are all kinds of rates. Realtors and auctioneers commonly charge a percentage of the sales price, and those percentages can range from 6 to 10%. Accountants and professional advisors charge rates upwards of $400 an hour. (See, Tenth and Final Application of Price Waterhouse, LLP filed in *In re CSI Enterprises, Inc.,* 220 B.R. 687 (Bankr.D.Colo.1998)). Expert witnesses, employed in cases, have charged at varying rates, one of which was $500 an hour for Sherman Muller, an expert employed in the *CSI* case. Investment bankers seek (but are not always allowed) rates of more than $500 an hour. *In re Gillett Holdings, Inc.,* 143 B.R. 256 (Bankr.D.Colo.1992) (blended rates for investment bankers that averaged $537 an hour were limited to $250).

■ The issue is further complicated by the suggestion that the Court should not use one rate for all services, but should use different rates for different services, the approach suggested by Mr. Seawell.[4] That approach is difficult to apply in this case because it is not necessarily true that there were only two kinds of services provided by the Trustee in this case—those commanding a high hourly rate and those commanding a more modest rate. The Circuit has recognized the difficulty with this approach and has opined that it is not erroneous to use a composite flat rate since that reflects the practice in the community and the legal profession. *Beard v. Teska,* 31 F.3d 942 (10th Cir.1994). Indeed, this was the approach utilized by the district court in its lodestar analysis in *Wiles.*

■ In choosing an hourly rate for the Trustee of $500 an hour, this Court took into consideration the various factors set forth above, as well as its experience gained in more than fourteen years of hearing complex bankruptcy cases. Unfortunately, in its prior opinion, those factors were not adequately set forth, and the district court, accordingly, found that the

---

3. The record reflects that Mr. Connolly currently charges for his services as an attorney a fee of $200 an hour.

4. Mr. Seawell did not opine that it was the custom in this community for professionals to charge in this manner.

rate was not supported. Considering those factors, this Court remains of the view that $500 an hour would not be unreasonable.

The Court is struggling to determine the size of a "reasonable" fee in this case. As previously observed, that is in inexact science. It is not a quest to fix an exact fee, or the precise fee, or even the proper fee. It is quest to find a "reasonable" fee, and that is one that may fall within a rather broad range. Because it is a subjective quest, it is one as to which reasonable people may, with respect to the judgments of all, differ. This Court certainly recognizes its role vis-a-vis the district court in this process. In deference to that role the Court will undertake a further analysis.

The Trustee brought to the administration of this bankruptcy case the highest levels of skill, commensurate with the finest attorneys Denver has to offer. He exhibited those skills not only in the handling of the fraud litigation, but in the prosecution and resolution of the various recovery actions, the reduction in the total allowed claims, and in all other aspects of the administration of this estate. Were he before the Court seeking fees for his services as the attorney for the estate the Court would have no hesitancy in finding that an hourly rate of $350/hour would be a reasonable rate for his services.

But, as already observed, Mr. Connolly is not here in his role as the attorney for the estate. He is here in his garb as the trustee of the estate. That role is more difficult and more stressful than the role of legal counsel because it carries with it the burden of deciding how much is enough. The buck stops at the trustee's desk, not at the desk of legal counsel. He is entitled to some recognition for the nature of the position and the services provided in the role of trustee. Considering the fees charged by such as investment bankers, consultants, by accountants and by other professionals, a rate of $400 per hour would be reasonable. Applied to the 1,779 hours accounted for by the Trustee[5] would result in a lodestar fee of $711,600.

This Court earlier considered the various *Johnson* factors and decided it would be appropriate to adjust the lodestar by a multiple of 3.5. The district court has found that in reaching this determination the Court erred (1) by over emphasizing the contingent nature of the fee, and (2) by giving the Trustee credit for the recovery of the entire $101.5 estate.

As to the contingent nature of the fee, it is true, as the district court points out, that the Trustee here was not at risk for the payment of his fee in the sense that the class action attorneys were at risk. Those attorneys were going to get nothing for their services if they did not prevail. The Trustee, however, was almost assuredly going to receive a fee commensurate with the size of the estate ultimately dealt with in this case. He was at risk in the sense that, had the litigation proceeded, more attorney fees would have been incurred and, had a larger judgment been achieved, it might well not have been fully collectible. And, of course, his fees are subject to allowance by the Court and it is now ever more clear that is a chancy business. Thus, while the Trustee may not have been in the position of, say, counsel for Harris (whose fees are not subject to the vagaries of the courts' decision making processes), he was not completely at risk to the chances of litigation success or failure. The Court believes this is a factor, but not a significant one.

An effort has been made to quantify the measure of the results achieved by the

---

**5.** This does not take into account the hours spent by the Trustee's support staff, nor does it give any credit for the time spent by Mr. Connolly that was not recorded. He testified that, when he was employed at the Gibson law firm, the pressures of reporting large quantities of time being spent on the MiniScribe case, at a time when payment was if not uncertain at least delayed, resulted in Mr. Connolly simply not reporting some of the time.

Trustee, and the Court has concluded that to recognize a recovery of $67.4 million would be reasonable. But what does that mean, and what is its significance in determining a proper adjustment to the lodestar figure?

Those who were present at the outset of the MiniScribe case, and who were then aware of the bleak promise this estate held, have to marvel at the ultimate results achieved. At the outset it appeared to be clear that SCB, as the significant secured creditor, would not achieve payment in full, much less there being anything left for the unsecured creditors. What occurred is payment in full for all of the non-subordinated creditors, and a residual dividend to the debenture holders, even after their pay up to the senior debt, of more than 10%.

It must be acknowledged that all that success achieved in this case is not solely attributable to the Trustee. There were his attorneys, the other attorneys, the other clients, the magistrate judge—all played a role in resolving the fraud litigation. But the Trustee conceived of the strategy that enabled his suit to move forward first. And he worked to structure the settlement so that there would be an assurance of funds to distribute to the debenture holders. He was instrumental in reducing the amount of allowed claims, and he was responsible for the innovative structure of the restructured Sunward settlement.

The district court, in *Wiles*, recognized the subjective nature of any lodestar multiplier. As the court there observed:

Commonly, a number is selected as a multiplier applied to the lodestar as the multiplicand. That methodology suggests some mathematical precision for exercising the kind of value judgment to be made. It is as artificial as the selection of a percentage of the fee. At bottom, courts must recognize that these judgments are not to be mere mathematical models. They should reflect the court's determination of the aggregate impact of the Johnson factors. *Wiles*, 150 F.R.D. at 184.

Having said that, the court there applied a multiple of 2.57. Considering all of those factors, the Court concludes that no less a multiple should apply here to the fees of the Trustee. Thus, the adjusted fee, via the lodestar analysis, would be $1,828,812.[6]

In reversing this Court's earlier fee order, and remanding the matter for further consideration, the district court did not find that the fee allowed was not a reasonable fee. Instead, the court opined that the fee award was not supported by the record or this Court's findings (as to the lodestar analysis) and that the use of the common fund approach was erroneous in the way it was applied.

The Court has now revised the analysis of the contribution made to this estate by the Trustee, and has considered that revised contribution both in the lodestar analysis and in the common fund analysis. The revised analysis, consistent with *Gottlieb*, suggests that a fee well in excess of the $3.04 million allowed could still be proper. To allow a fee to the Trustee in that amount would result in a total administrative burden in this estate of $10.9 million, which is 16% of the fund attributable to the efforts of the Trustee. That is less than 75% of the comparable administrative burden found by the Circuit to be reasonable in *Gottlieb*.

In closing arguments at the trial of this matter, counsel for the Trustee chose to remind this Court that "the bankruptcy court is not the bargain basement of the federal court system." *In re Ingersoll*, 238 B.R. 202, 208 (D.Colo.1999). Writing on a clean slate, this Court might be persuaded that the adjusted lodestar amount of $1,828,812 would be a "reasonable" fee in this case. But this is not a clean slate. It is a slate previously written on by the Circuit in *Gottlieb*.

In allowing fees to the Trustee there is nothing in section 330 of the Code that

6. At $500/hour the adjusted lodestar would be $2,286,015.

mandates the use of the lodestar analysis. It is but a factor to consider. In this case, in the final analysis, this Court cannot distance itself from *Gottlieb.* The two cases are too similar, and there is no reason that can be perceived by this Court why the professionals, including the Trustee, in this bankruptcy proceeding should be paid on a lesser basis (except to the extent they expressly agreed to work at a fixed rate, as was the case with counsel for the Trustee).

That the debenture holders bear a disproportionate part of the fee is simply the result of the bargain they made. As far as the accounting for the administration of this estate is concerned, the administrative fees come off the top and are allocable to all of the creditors pro rata. To administer this estate, conclude the kind of litigation that was involved, effect the recoveries from the transfer litigation, reduce the claims, generally attend to the administrative matters here, and provide for the payment of all of the professional fees, all for an administrative burden of less than 16% of the estate now attributable to the Trustee, is a bargain. The Court finds that a fee for the Trustee of $3,044,953.69, is reasonable and is ALLOWED.