**In re Dean A. GARCIA and Karen M. Jencks Garcia a/k/a Karen Jencks, Debtors.**

No. 03–06041–H7.

United States Bankruptcy Court, S.D. California.

Nov. 22, 2004.

Richard M. Kipperman, Corporate Management, La Mesa, CA, Chapter 7 Trustee.

Gary E. Slater, Esq., Ferrette & Slater, San Diego, CA, for Chapter 7 Trustee.

## MEMORANDUM DECISION

JOHN J. HARGROVE, Chief Judge.

The chapter 7 trustee's attorneys, Ferrette & Slater ("the firm") applied for compensation under § 330(a)(1). At issue is whether the firm should be denied some, or all, of the requested compensation because 1) it performed services that fell within the ambit of the trustee's duties under § 704 and 2) it performed services that were unnecessary to the administration of the estate and that offered no benefit to the estate under § 330(a)(3)(C).

The chapter 7 trustee, Richard M. Kipperman ("the trustee"), also applied for compensation in the amount of $3,050, the statutory cap allowed under § 326(a). At issue is whether the trustee's request for the statutory cap exceeds the amount of reasonable compensation as defined in § 330(a)(3).

This Court has jurisdiction to determine this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(1) and General Order No. 312–D of the United States District Court for the Southern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

### I.

#### FACTS

A. *THE PETITION AND STATUS OF THE CASE*

Debtors filed their chapter 7 petition on June 26, 2003. Richard M. Kipperman was appointed trustee. The schedules show that debtors owned real property that they valued at $255,000. Debtors indicated a $175,000 first deed of trust against the property and claimed a $59,600 homestead exemption. Debtors also listed a 2001 Toyota Camry Solara valued at $13,544 and a leased 2002 Volkswagen Jetta valued at $12,982. Liabilities were listed as approximately $60,000 in miscellaneous unsecured credit card debt.

Early in the case, the trustee questioned the debtors' valuation of their real property. The trustee subsequently had his broker do a valuation which came in at $310,000. The trustee calculated that the net equity to the estate could be $38,000, if the listing price was obtained upon a sale. Eventually, the debtors agreed to pay the estate the sum of $28,000, in exchange for the trustee's abandonment of the estate's interest in their real property. *See* Application for Interim Compensation for Richard M. Kipperman, Trustee Chapter 7 [hereinafter Kipperman Fee App.] 2:20–28; 3:1–6 [Docket # 39].

The docket shows that the firm submitted its employment application on behalf of the trustee, that the firm also submitted the application to hire a real estate broker on behalf of the trustee to sell the debtors' real property, and that the trustee hired Dean Johnson ("Johnson"), an accountant. The docket also shows that the firm filed a notice of intended action regarding the debtors' purchase of equity in their home for $28,000. Subsequently, the firm submitted the stipulation between the trustee and the debtors regarding the sale. The trustee also set a claims bar date. The remaining entries on the docket all relate to the various fee applications of the firm, Johnson, and the trustee.

The trustee has approximately $28,000 on hand as a result of the settlement with the debtors. Administrative fees, if allowed in full, will total approximately $16,078.73 (including the $750 "clean-up" fee requested by the firm), or 57% of the total recovery from the sale of debtors' equity in their residence. The trustee was unable to inform the Court at the time of the hearing what the estimated payout

would be to those creditors who had filed claims.

## B. *THE FIRM'S EMPLOYMENT AND COMPENSATION REQUEST*

On October 21, 2003, an *ex parte* order was entered by this Court authorizing the trustee to retain the firm. [Docket # 13]. The firm's *ex parte* application for "Approval of Ferrette and Slater as General Counsel to the Trustee" simply states that the trustee investigated the assets, believed that a sale of the debtors' home would be a source of recovery for creditors, and that he "selected Ferrette & Slater for the reason that it is familiar with the relevant facts and applicable law and is well-prepared to undertake the legal services required in this matter that may be necessary." *See* Ex Parte Application ¶¶ 2, 5 [Docket # 11]. There was no explanation regarding what legal services "may be necessary" and no further detail regarding the scope of the firm's employment set forth in the application. In Gary E. Slater's declaration accompanying the *ex parte* application, Mr. Slater states "Ferrette and Slater has been engaged by the Trustee to represent him as general counsel to assist with the sale and other matters related to the Debtors' interest in real property . . . . and to analyze estate claims where legal issue[s] exist . . . . " [1] *See* Declaration of Gary E. Slater of Ferrette & Slater in Support of Application for Employment of General Counsel to the Trustee [hereinafter Slater Decl.] 2:16–20 [Docket # 12].

The firm seeks compensation for professional services in the sum of $10,679.50 and reimbursement of expenses in the sum of $273.15. The firm seeks an additional $750 as a "clean-up" fee for any miscellaneous legal work and costs incurred after the submission of its application. The firm spent a total of 58.2 hours at an average hourly rate of $183.50.

The hearing on the firm's fee application was held on July 16, 2004. The Court questioned the firm about many of its services and heard oral argument of counsel. The Court gave the firm time to submit a supplemental brief and declaration addressing *inter alia* 1) whether some of the work performed by the firm should have been performed by the trustee; and 2) whether the time spent on the fee application was excessive.[2] The hearing on the firm's fee application was continued to September 30, 2004, and the Court requested that the trustee's fee application be noticed for that same date.

## C. *THE TRUSTEE'S FEE REQUEST*

The Trustee seeks the statutory cap of $3,050. The trustee's time sheets reflected 16.10 hours which includes 3.5 hours of estimated time to conclude the case.

---

**1.** The firm argued in its supplemental brief that the Court should address any specific aspects of legal representation at the employment stage rather than deny compensation after the work has been done. *See* Supplemental Brief in Support of First and Final Fee Application for Order Authorizing Payment of Attorney's Fees and Reimbursement of Costs to Attorneys for Chapter 7 Trustee [hereinafter Supp. Br.] 2:17–27. However, as this Court noted at the hearing on this matter, an experienced bankruptcy firm such as Ferrette and Slater is charged with knowing the law when it comes into Court seeking employment. *See In re EZ Feed Cube Co., Ltd.,* 123 B.R. 69, 73 (Bankr.D.Or.1991) ("[A]ttorneys practicing in bankruptcy court are presumed to know the applicable law.").

**2.** One court noted that "[t]o make the hearing meaningful, the court should first apprise the applicant of the particular questions and objections it harbors, a role which the adversary in a statutory fee case would typically play." *In re Busy Beaver Bldg. Ctrs., Inc.,* 19 F.3d 833, 846 (3rd Cir.1994) (citation omitted).

Both the firm's and the trustee's fee applications came on for hearing September 30, 2004. After hearing oral argument, the Court took both matters under submission.

## II.

### *DISCUSSION*

### A. *THE COURT HAS AN INDEPENDENT DUTY TO EXAMINE FEE APPLICATIONS*

■ The Court has an independent duty to investigate the reasonableness of compensation sought under Federal Rule Bankruptcy Procedure 2016(a). The Court may, "on its own motion...award compensation that is less than the amount of compensation requested." *See* 11 U.S.C. § 330(a)(2).

■ "Beyond possessing the power, we think the bankruptcy court has a *duty* to review fee applications, notwithstanding the absence of objections by the United States trustee ('UST'), creditors, or any other interested party, a duty which the Code does not expressly lay out but which we believe derives from the court's inherent obligation to monitor the debtor's estate and to serve the public interest." *Busy Beaver*, 19 F.3d at 841;[3] *see also In re Maruko, Inc.*, 160 B.R. 633, 637–638 (Bankr.S.D.Cal.1993).

### B. *PROPERLY COMPENSABLE LEGAL SERVICES FOR A TRUSTEE'S ATTORNEY*

■ "Only when unique difficulties arise may compensation be provided for services which coincide or overlap with the trustee's duties...." *In re United States Trustee*, 32 F.3d 1370, 1373 (9th Cir.1994) (citations omitted). It is well established that "[a]n attorney is never entitled to professional compensation for performing duties which the statute imposes upon the trustee." *In re Shades of Beauty, Inc.*, 56 B.R. 946, 949 (Bankr.E.D.N.Y.1986), *aff'd in part*, 95 B.R. 17 (E.D.N.Y.1988) (citations omitted). "The function of an attorney for a trustee is to render to the estate those services which cannot and should not properly be performed by one who does not have a license to practice law." *Shades of Beauty*, 56 B.R. at 949 (citations omitted). "[T]he threshold question should be whether the services performed were those which one not licensed to practice law could properly perform for another for compensation." *Id.; see also Handbook for Chapter 7 Trustees*, U.S. Dept. of Justice, Executive Office for the United States Trustees [hereinafter Handbook for Chapter 7 Trustees], Chapter 8, ¶ M(5) at p. 8–25 (March 1, 2001) ("Attorneys and accountants may not be compensated for performing the statutory duties of the trustee.") *citing* § 704 and Fed. R. Bankr. P.2015(a).[4]

**3.** The Third Circuit went on to state:
[T]he integrity of the bankruptcy system ... is at stake in the issue of a bankruptcy judge's performance of the duty to review fee applications sua sponte. The public expects, and has a right to expect, that an order of a court is a judge's certification that the result is proper and justified under the law.... Nothing better serves to allay [public perceptions that high professional fees unduly drive up bankruptcy costs] than the recognition that a bankruptcy judge, before a fee application is approved, is

obliged to [review it carefully] and find it personally acceptable, irrespective of the (always welcomed) observation of the [United States trustee] or other interested parties. *Busy Beaver*, 19 F.3d at 841 (citations omitted).

**4.** The Court notes that generally the following are considered trustee duties for which attorney's fees are not allowed: "Services relating to the sale of the debtor's assets; Collection of accounts due; Examination of the debtor's papers; Preparation of notices and advertise-

## C. THE EXTENT OF THE COMPENSATION: SECTION 330(a)

■ "Once it has been established to the Court's satisfaction that the services for which compensation is to be awarded were properly compensable, the Court should next determine whether or not the services for which compensation is sought were 'actual and necessary.'" *Shades of Beauty*, 56 B.R. at 950 (citations omitted).

Section 330(a)(1) provides that "[a]fter notice...and a hearing...the court may award to a...professional person...employed under section 327...

A) reasonable compensation for actual, necessary services rendered by the...professional person...; and

B) reimbursement for actual, necessary expenses."

Section 330(a)(3) further instructs the Court that "[i]n determining the amount of reasonable compensation to be awarded, the Court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including–

A) the time spent on such services;

B) the rates charged for such services;

C) whether such services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of a case under this title;

D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

E) whether the compensation is reasonable based on customary compensation charged by comparably skilled practitioners in cases other than cases under this title."

■ The only possible way for the Court to examine the standards set forth in § 330(a) is through the review of an attorney's detailed application and time sheets. Attorneys need to be specific.

[I]n order to permit the court to evaluate the application properly, it should contain the following: a statement explaining the significance of each item of professional service for which compensation is sought, as well as an explanation of the purpose, necessity and appropriateness of each such service; a statement of the effectiveness of each such item; a statement of what alternatives were considered by the attorney together with the method of analysis relied upon for choosing the action taken; a statement of any difficult or unusual problems which arose in the case and the manner in which they were addressed and if the attorney believes his services were worth more than their mere time value, a statement setting forth the reason[s] therefore. *Shades of Beauty*, 56 B.R. at 950 (citation omitted).

In short, the Court cannot award compensation where the fee application and time entries lack specificity.

### THE FIRM'S COMPENSATION REQUEST

## D. ENTRIES NOT INVOLVING LEGAL ANALYSIS OR SKILL

The first step in the Court's analysis is to examine whether the services per-

ments for the sales of the debtor's assets, and license renewals; Routine telephone calls and correspondence with information seekers; Reduction of the estate to money; Payment of routine bills, including taxes; Arranging insurance coverage; Arranging for appraisals of the estate; Corresponding with creditors re documentation of claims; Reviewing title reports; Preparing and filing objections to claims; Preparing application for employment of professional; Acting as liaison with special counsel." *In re McKenna*, 93 B.R. 238, 241 (Bankr.E.D.Cal.1988) (citation omitted).

formed by the firm involved legal skills which would make them compensable. The Court has examined the time sheets of the firm at length. There are many entries that either do not involve the legal skills of an attorney or do not contain enough specificity in order for the Court to determine that the services involved legal skills.

### 1. STANDARD BANKRUPTCY ADMINISTRATION "CATEGORY A"

 The need for the firm's services must be apparent from the description of the services set forth in the fee application. Services described simply as "review debtors' schedules and statement of affairs" or "review bankruptcy court docket" do not tell the Court anything about what legal analysis or issues were involved in the review. "In addition, if an otherwise generally noncompensable service is deemed compensable by the professional and included in the fee application because of the complexity of the matter involved, the professional must describe the service and the complexity in sufficient detail so the court can see on the face of the application that the service indeed requires the use of the professional." *In re Holub*, 129 B.R. 293, 296 (Bankr.M.D.Fla.1991).

 There is no satisfactory explanation why both Gary E. Slater, the attorney in this case, and Charlotte Seltzer, his paralegal, conducted reviews of the schedules and statement of affairs. The firm argues that a "review of the schedules often reveals legal issues such as exemption disputes, co-ownership issues, tax issues, secured creditor issues, and lien avoidance issues. Any counsel representing a Chapter 7 Trustee that does not review the schedules and Statement of Financial Affairs takes the chance that significant legal issues will be missed." Supp. Br. ¶ 5. However, the firm overlooks that it

is the trustee's duty, not his attorneys, to review schedules and the statement of financial affairs to ascertain whether issues exist that would require professional legal skills. *Id.* at 295 (noting that a preliminary review of the schedules and attending the 341(a) meeting fall within the scope of the trustee's duties).

The *Handbook for Chapter 7 Trustees*, Chapter 8, ¶ M(5) at p. 8–25 (March 1, 2001) also provides:

> The following list includes examples of services considered to fall within the duties of a trustee:
>
> a. preparing for and examining the debtor at the § 341(a) meeting in order to verify factual matters;....

A trustee must be competent to perform a review of the schedules and statement of financial affairs in order to carry out his or her duties set forth in § 704. The firm's argument would require a trustee to hire an attorney in every case to conduct a review of the schedules and the statement of the financial affairs to determine whether legal issues exist. Interestingly, none of the legal issues mentioned by the firm presented themselves in this case.

 Moreover, the firm's paralegal billed time for file organization. *See* entry for 9/30/04. Without any explanation as to the complexity of the task which would require a paralegal's services, organization of files would appear to be routine secretarial work for which the firm's paralegal bills $125 per hour. *See Busy Beaver*, 19 F.3d at 851 (noting that "the classification of services as clerical or non-clerical does not decide the question of compensability under § 330; clerical services may be compensated in the proper context.") (citations omitted); *Missouri v. Jenkins*, 491 U.S. 274, 288 at n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) (stating that, "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of

who performs them"); *see also United States Trustee Guidelines For Reviewing Applications For Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330,* Sec. II, (E)(7) at p. 7 (Jan. 30, 1996).

■ Finally, ascertaining the tax consequences of the settlement between the debtors and the trustee constituted performance of the trustee's duties especially in light of the fact that the trustee had hired another professional, Dean Johnson, a CPA, as his accountant. The trustee attempted to justify the services by the firm by stating that "if Mr. Slater calls Mr. Johnson directly to get the answer or I call Mr. Johnson to get the answer and then I call Mr. Slater to give him the answer, the time's going to be the same. . . ." *See* Tr. dated 9/30/04 44:21–25. Nonetheless, as further explained below, what the trustee fails to recognize is that there was no need for the firm to get involved in the sale of debtors' equity.

The Court finds therefore that the following time is not compensable.

| Date | Description | Biller | Amount Disallowed |
|------|-------------|--------|-------------------|
| 9/29/03 | REVIEW E–MAIL FROM TRUSTEE WITH LISTING AGREEMENT FOR SALE OF RESIDENCE AND REVIEW BANKRUPTCY COURT DOCKET SEARCH (PACER) DOCKET ON GARCIA CASE | GES | $1.00 \times \$275 = \$275$ |
| 9/30/03 | FILE ORGANIZATION | CS | $.70 \times \$125 = \$87.50$ |
| 9/30/03 | RESEARCH BANKRUPTCY FILING AND EXTENSIVE REVIEW OF BANKRUPTCY PLEADINGS | CS | $.80 \times \$125 = \$100$ |
| 10/1/03 | REVIEW DEBTOR'S SCHEDULES AND STATEMENT OF AFFAIRS | GES | $.30 \times \$275 = \$82.50$ |
| 11/3/03 | REVIEW BANKRUPTCY COURT DOCKET SEARCH (PACER) REGARDING STATUS OF DEBTORS' DISCHARGE | GES | $.20 \times \$275 = \$55$ |
| 1/28/04 | TELEPHONE CONFERENCE WITH D. JOHNSON REGARDING TAX CONSEQUENCES OF SETTLEMENT | GES | $.20 \times \$275 = \$55$ |
| 2/12/04 | REVIEW FILE REGARDING STATUS OF ADMINISTRATION | GES | $.10 \times \$300 = \$30$ |
| 5/10/04 | MEMO TO TRUSTEE REGARDING ACCOUNTANT | CS | $.20 \times \$125 = \$25$ |
| | TOTAL | | $710 |

2. *EMPLOYMENT APPLICATIONS "CATEGORY B"*

■ One court noted that "[p]reparation of the application for employment of a professional is another manifestation of the trustee's first, second, and fourth enumerated duties, all of which imply a duty to administer the estate." *McKenna,* 93 B.R. at 241 *citing* 11 U.S.C. § 704(1), (2), and (4). The Court reviewed the firm's services in this category regarding its employment of the real estate broker.

The Court examined the application to employ the real estate broker, which is two and one-half pages, the accompanying declaration, which is three paragraphs, and the order which is less than a page. The employment of the real estate broker was straightforward and this Court could discern no legal analysis that was involved in any of the documents submitted.

Even assuming that somehow the legal services of the firm were needed in this case to employ the real estate broker as the firm contends, neither the time sheets nor the firm's supplemental brief demonstrates that the broker's employment in this case involved legal issues. At the hearing on this matter, Mr. Slater stated that "our application to employ a broker was the cutting edge application in the district, which people now follow...so our application to employ a broker requires— the exhibits require adjustments to the broker's listing agreement, an addendum, and it's basically contract services." *See* Tr. dated 9/30/04 29:14–25; 30:1–2. But this explanation doesn't support the notion that legal services were involved with respect to the employment of the broker in this case.

Interestingly, the trustee employed a broker by himself in *In re Real–Baeza*, Southern District of California Bankruptcy Case No. 04–02263–A7, without the assistance of counsel. The Court takes judicial notice of the pleadings in *In re Real– Baeza* pursuant to Federal Rule Evidence 201. The trustee's action in *Real–Baeza* clearly shows he is capable of doing this simple administrative task without the assistance of counsel. Preparing the application for employment of professionals is generally considered trustee work. *McKenna*, 93 B.R. at 241 (Bankr.E.D.Cal. 1988) (citations omitted). The Court finds that none of the time spent for employing the real estate broker is compensable.

3. *ASSET DISPOSITION: SALE OF SAN MARCOS PROPERTY CATE-GORY "C"*

 The firm expended 29.7 hours in this category and requests $5,676 for its services. The firm's services in this category can be summarized as follows: reviewing the listing agreement; communi-

cating with the broker; negotiating with debtors' attorney regarding the sale of equity to the debtors; reviewing the title report; and preparing the stipulation and mutual releases between the debtors and the trustee.

With respect to the sale of real property in a bankruptcy proceeding, the firm contends that real estate brokers are not qualified to handle the legal aspects of sales of real estate in bankruptcy court and that most trustees are unwilling to accept the risks associated with such transactions without legal counsel. Supp. Br. at p. 3. The firm contends that several factors make counsel necessary for sales of real property in the bankruptcy context: "1) the debtor is an unwilling seller; 2) the disclosure requirements for bankruptcy trustees significantly diverge from the disclosure requirements for non-bankruptcy transactions; 3) the contractual arrangement with the proposed buyer is affected by the contingencies related to Court approval and overbids; and 4) the treatment of liens on the property is obviously significantly different." Supp. Br. at p. 3. The firm goes on to state that "in the bankruptcy sales context, attorneys are not only needed to complete the required procedural steps, but also to analyze and prevent possible roadblocks to the completion of the transaction, to limit liability to the Trustee and the estate, and to handle and resolve the problems which do arise." Supp. Br. at p. 3–4. Unfortunately, the firm's supplemental brief speaks only in generalities and tells the Court nothing about what unique difficulties were involved in this case that required the services of an attorney.

 There is also no satisfactory explanation as to why both Gary E. Slater and his paralegal needed to review the listing agreement and no description regarding the legal analysis of the issues

involved. "Services relating to the sale of the debtors' assets" are generally considered to fall within the scope of the trustee's duties. *McKenna,* 93 B.R. at 242 (citations omitted). Routine telephone calls with the broker are likewise not compensable as legal work. *Id.*

Moreover, as early as October 20, 2003, the firm's time sheets reflect that the debtors had inquired about buying the equity in the house. The time sheets show that from that point on, the firm conducted all the negotiations with the debtors' attorney regarding the "buy-out" of the equity and simply acted as a conduit between the trustee and the debtors' attorney. There is no explanation as to why the firm had to be constantly involved in the exchange of e-mails between the debtors' attorney and the trustee. The time entry on 10/21/03 is illustrative. The firm's activity as a "middleman" only added unnecessarily to the layer of administrative expense in this case.

The firm argues that the "negotiations with the Debtors' attorney primarily involved the market value of the Debtors' residence, and ultimately, the price which would be paid by the Debtors for the net equity in the property." Supp. Br. 4:26–28. The firm's explanation supports the Court's conclusion that no legal work was involved in the negotiations regarding the buy-out price the debtors would pay for their equity. By the firm's own admission, the only issue involved simple mathematics and did not involve any legal analysis.

The firm also argues that "in the absence of trustee's counsel, it is questionable whether the sale of the debtors' real property, or the equity purchase transaction, would have ultimately been consummated." Supp. Br. 3:5–6. Yet, the firm never explains why.

Interestingly, the firm contends that prior to its involvement, "the Trustee made attempts to negotiate with Debtors' attorney regarding either a sale of the Debtors' residence, or Debtors' purchase of the net equity in the residence. These attempts were unsuccessful, and therefore the Trustee sought to employ ... Slater to assist with resolution of certain legal issues...." Supp. Br. 4:18–22. Yet, the word "negotiation" is never even mentioned in the trustee's time sheets prior to the firm's involvement.

The trustee made an offer of proof at the hearing on this matter that he did attempt to resolve the matter with the debtors' attorney despite the fact that his time sheets did not reflect he did so. However, when he was unsuccessful, "it became necessary" for him to hire counsel. *See* Tr. dated 9/30/04 25:5–6. It is unclear to the Court why the trustee had to hire counsel when the negotiations broke down because Mr. Slater stated at the hearing "when the application [to hire the real estate broker] was served, ... on October 9, so [debtors' attorney] got it, and that is what actually got him off the dime." *See* Tr. dated 9/30/04 25:19–21. Although this Court could find no proof of service on the docket regarding the service of the broker's application on the debtors' attorney, it appears that all the trustee had to do was to get the broker employed (which fell within the scope of his duties) in order to get debtors' counsel to resume negotiations. In sum, the Court finds that all the services relating to the negotiations fall within the scope of the trustee's duties— the duty to collect and reduce to money the property of the estate under § 704(1). The negotiations were simply about the amount the debtors would pay.

■ With respect to the firm's review of the title report, the only explanation offered by the firm is that its "preliminary assessment indicated that the property

might be subject to a 'wild' deed of trust." Supp. Br. 5:22:25. The firm, however, provides no additional facts regarding the so-called wild deed. Further, no sale of the property ever took place and the debtors simply bought the equity. With no apparent legal issues present, reviewing the title report is part of the trustee's duties. *McKenna*, 93 B.R. at 241 (citation omitted).

Finally, the Court notes that the firm spent approximately 16.4 hours for a total of $3,155.50 on preparing the stipulation and mutual releases between the debtors and the trustee.[5] The stipulation and order is a mere five pages, with one page consisting of signatures. *See* Stipulation and Order [Docket # 27]. The stipulation was quite simple and no releases were indicated within the stipulation. The Court accepted Mr. Slater's offer of proof at the September 30, 2004, hearing that the releases were prepared and signed. But, the releases were not included in the record, so the Court did not have the opportunity to examine how complex they might have been.[6] The declaration of Gary E. Slater accompanying the order approving the stipulation consisted of one and one-half pages. *See* Declaration of Gary E. Slater in Support of Seeking Entry of Order Approving Stipulation Re Compromise and Liquidation of Debtors' Residence [Docket # 28]. Lastly, the Notice of Intended Action was simply a form with a few paragraphs typed in regarding the agreement between the trustee and the debtors. *See* Notice of Intended Action re Trustee and Debtors [Docket # 23].

In light of the simplicity of the documents noted above, and the lack of evidence regarding the releases, the Court finds that the services relating to the stipulation and mutual releases are not compensable as legal work. Again, usually in these situations where a debtor purchases the equity in his or her residence in order to avoid losing it to a sale, the debtors' attorney would prepare the stipulation. Perhaps the trustee may hire an attorney to review the stipulation for legal issues, but that is not the situation in this case since the firm again simply took over all the work in the case.

Accordingly, the Court finds that $5,676 for the 29.7 hours of work associated with the sale of the debtors' property is not compensable.

### 4. CLAIMS ADMINISTRATION AND OBJECTIONS

██ Examining claims and objecting to the allowance of any claim that is improper clearly falls within the scope of the trustee's duties under § 704(5). *McKenna*, 93 B.R. at 242 (citation omitted). Again, the firm's time sheets, its supplemental brief, and the narrative portion of its fee application, all fail to identify the legal issues that were involved with the claims in this case. On the first entry under this category on 12/30/03, the firm sent a memo to the trustee to set the claims bar date. The trustee should have been reminded of this most basic duty by his secretary and not an attorney billing at $300 per hour. The firm then charges the estate to review the order setting the claims bar date, but it is unclear why it was necessary for it to do so.

Also of note is that in Gary E. Slater's declaration in support of his firm's *ex parte* application for employment, Mr. Sla-

---

5. These services are indicated on the following dates: 12/1/03; 12/2/03; 12/5/03; 12/30/03; 12/31/03; 1/5/04; 1/6/04; 1/13/04; 1/14/04; 1/15/04; 1/25/04;.

6. Despite the Court giving the firm several months to supplement his fee application.

ter discusses his firm's conflict with Bank of America and in connection with that disclosure states "Bank of America has been informed that should the occasion arise that the Trustee needs assistance from counsel to deal with the Bank of America's claim, the Trustee shall employ special counsel for that purpose or handle the matter on his own... In a chapter 7 case of this kind, *the Trustee typically handles the review and objections to claims, if any, on his own, without counsel.*" Slater Decl. 2:7–15 [Docket # 12] (emphasis added).

None of the entries associated with the firm's services in the Claims Administration and Objections category are compensable. The Court therefore finds that $475 is disallowed.

With respect to the matters discussed above, the Court finds that this case was routine and there were no unusual difficulties that required the skills of counsel in connection with 1) the reviewing of schedules; 2) the employment of the real estate broker; 3) the review of the title report; 4) the negotiations with the debtors' attorney regarding the sale of equity to the debtor; or 5) the review of claims. There was one asset—the equity in the debtors' home—to administer and it was the trustee's duty to administer that asset.

■ Both counsel for trustees, and trustees themselves, should be fully aware that counsel can be compensated only for services that require the exercise of professional legal skills and expertise beyond the ordinary knowledge and skill of the trustee. "The reasons proferred [sic] for the above rules are first that the duplication of the trustee's and attorney's services would result in the unnecessary depletion of the debtor's estate, and second that the attorney's assumption of the trustee's duties would be a derogation of the statutory scheme." *In re King,* 88 B.R. 768,

770 (Bankr.E.D.Va.1988) (citation omitted); *see also* 3 Collier on Bankruptcy ¶ 330.03[2][b], at 330–21 (15th ed. rev.2004) ("disallowing compensation for trustee duties delegated to a professional avoids the risk that the estate will be depleted through separate charges for duplicative services"). The *Handbook for Chapter 7 Trustees,* Chapter 8, ¶ M(4) at p. 8–24 states:

> The trustee is a fiduciary and representative of the estate. Trustees cannot avoid or abdicate their responsibilities by employing professionals and delegating to them certain tasks. It is critical that the trustee oversees the work performed by professionals and exercises appropriate business judgment on all key decisions.

The *Handbook for Chapter 7 Trustees,* Chapter 8, ¶ M(2) at p. 8–22 further states:

> The threshold question for the employment of any professional is the necessity of employment.... Conversely, professionals are not to do ministerial work or perform the duties of a trustee.
>
> . . .
>
> The trustee must determine whether the services of a professional are needed and whether the cost is warranted. Further, the trustee should determine at the outset the level of professional work required and the estimated costs and benefits associated with the work.

At the hearing, Mr. Slater argued that "reasonable minds can differ" as to what constitutes a legal service. *See* Tr. dated 9/30/04 11:12–17; 12:9–11; 14:4–7. Several courts have provided guidance in this regard. One court described compensable legal services:

> [Where] [t]here were unusual difficulties relating to various real and personal property sales that required legal expertise, involving tax loss carryovers, lien

status determinations (perfection and priority), and problems relating to mortgage interest rates and moratoria, as well as activities requiring legal expertise such as negotiations for postpetition payment and indemnity arrangements, and moratoria, and negotiating and arranging postpetition loans and certificates of indebtedness such services were compensable as legal services. . . . In those instances where insufficient explanatory information did not enable a determination of the precise nature of the services rendered . . . the services were not compensable as legal services. *See In re McAuley Textile Corp.*, 11 B.R. 646, 648 (Bankr.D.Maine 1981) (citations omitted).

Another court noted:

[P]rofessional time is limited to those tasks performed while representing the trustee in the prosecution of contested matters and adversary proceedings, attendance at court hearings in the capacity of attorney or other professional when the trustee has an interest, the preparation of professional related applications, and the performance of other specialized services that cannot be performed practically or lawfully by the trustee without engaging the services of a professional. *Holub*, 129 B.R. at 296.

To avoid problems in the future, it would behoove trustees and their counsel to

[S]et procedures whereby trustee duties are performed by the trustee, and not the attorney, so that each is performing the job that he or she was appointed to perform. For example, at the start of a case, the trustee should implement a system whereby routine calls from creditors, employees, and other parties seeking information should be routed through the trustee, not the attorney. The trustee is generally expected to perform the preparatory work to collect receivables, analyze preferences, hire professionals, liquidate assets, and answer inquiries from creditors, employees, and professionals related to the administration of the estate. *In re Columbia Plastics, Inc.*, 251 B.R. 580, 586 (Bankr.W.D.Wash. 2000)

The need for such coordination is evident in this case.

### E. *ENTRIES FOR SERVICES WHICH WERE UNNECESSARY AND DID NOT BENEFIT THE ESTATE UNDER SECTION 330(a)(3)(C)*

Although the following services do not fall within the ambit of the trustee's duties under § 704, the services are not compensable since they were neither necessary nor beneficial to the administration of the estate under § 330(a)(3)(C).

#### 1. *THE FIRM'S CONFLICT WITH BANK OF AMERICA*

■■■ The firm's services in connection with its conflict with the Bank of America were listed under Category "B", Employment Applications.

The firm acknowledged in its declaration in support of employment application that it represented Bank of America who also was a creditor of this estate. *See* Slater Decl. ¶¶ 4–5 [Docket # 12]. Nonetheless, the Court fails to discern how services rendered in connection with the firm's conflict were necessary to the administration of, or beneficial to this estate. The rest of the unsecured creditor body should not have to pay the firm for its work in connection with its conflict. Mr. Slater conceded as much at the hearing on September 30, 2004, and stated "we won't do it again." *See* Tr. dated 9/30/04 36:18–20. Even so, what is disturbing to this Court is that Mr. Slater, an experienced attorney, should have known that such services could not be compensated from the estate.

Moreover, neither the trustee nor the United States Trustee Office objected to the entries which clearly did not benefit this chapter 7 estate.

The Court finds the following time is not compensable.

| DATE | DESCRIPTION | BILLER | AMOUNT |
|---|---|---|---|
| 10/3/03 | REVIEW LETTER TO C. BUTLER RE-GARDING WAIVER OF CONFLICT BY BANK OF AMERICA. | TJT | .20 × $240 = $48 |
| 10/3/03 | PREPARE BANK OF AMERICA CON-FLICT LETTER. | CS | .70 × $125 = $87.50 |
| 10/14/03 | REVIEW MEMO FROM R. KIPPERMAN AND APPROVED CONFLICT WAIVER | TJT | .10 × $240 = $24.00 |
| 10/24/03 | REVIEW LETTER FROM C. BUTLER REGARDING WAIVER OF POTENTIAL CONFLICT | TJT | .10 × $240 = $24.00 |
| | TOTAL | | $183.50 |

## 2. SECRETARIAL OVERHEAD

■ The firm billed D. Chambers, a legal assistant, at $80 per hour. Although it may be customary to bill for a legal assistant outside the bankruptcy arena, the Court has no evidence before it in this regard.

An examination of Ms. Chambers services indicate that she is performing secretarial services. For example on 11/14/03, she prepared a letter to Richard Kipperman, trustee sending attorney Gary E. Slater's letter to attorney Burton (.20); on 11/25/03 she prepared a letter to attorney Burton sending letter and stipulation regarding compromise and litigation of debtors residences (.20); on 1/16/04 she prepared an e-mail to attorney Burton and R. Kipperman sending attorney Gary E. Slater's letter dated 1/6/03 along with Mutual Release of All Claims (.40); on 1/26/04 she had a telephone call with attorney Burton regarding check regarding sale of San Marcos property (.20); on 2/2/04 she prepared a letter to Mr. Kipperman sending copy of check from attorney Burton (.20); and on 2/19/04 she prepared a letter to R. Kipperman sending check regarding Stipulation and Order regarding Compromise and liquidation of Debtors' Residence (.30).

There is no explanation regarding the complexity of these tasks which would require a "legal assistant" to do them at $80 per hour. These services are secretarial in nature and not compensable. *See Missouri v. Jenkins,* 491 U.S. at 288 at n. 10, 109 S.Ct. 2463 (stating that, "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them"); *see also United States Trustee Guidelines For Reviewing Applications For Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330,* Sec. II, (E)(7) at p. 7 (Jan. 30, 1996).

## 3. FINAL ADJUSTMENTS

■ Unfortunately, after extensively reviewing the time sheets, and making the adjustments noted above, the Court finds that the remaining services relate to routine case administration services in Category "A" for Standard Bankruptcy Administration (approximately $128 remaining after taking deductions for disallowed time above); the firm's employment application which is listed under Category "B" Employment Applications; and its services related to the preparation of fee applications in Category "E" Fee Applications ($2,425).

Since the vast majority of the firm's services were disallowed because they constituted the work of the trustee, the Court cannot justify allowing compensation for the remaining time under Standard Bankruptcy Administration, nor can the Court justify allowing compensation for services related to the firm's employment application and preparation of the fee application.

■ With respect to the preparation of the fee application, the firm spent 13.80 hours. The amount requested is approximately 29.37% of the total fees ($8454 ÷ $2425). The Court finds that even without the deductions taken above for noncompensable services, the firm's request for preparation of the fee application is unreasonable and warrants comment from the Court.

The firm contends that 10% allocated to fee application preparation is unrealistic because of the mandatory procedural steps which must be taken in the preparation of fee applications to comply with the U.S. Trustee Guidelines. Supp. Br. 6:6–15. According to the firm, it must spend the time, regardless of the total fees spent, and it seeks to "get it right" the first time. Supp. Br. 6:16–23. Therefore, the firm contends that the primary determination should be how many hours should it reasonably take to prepare an application for compensation which complies with the U.S. Trustee's Guidelines. The firm submits that 13.8 hours is reasonable for this case particularly where 75% of the time was spent by a paralegal. Supp. Br. 7:2–4.

The firm's paralegal spent approximately 9.5 hours in preparing the fee application. No information is provided regarding the educational background or experience of the paralegal, but this was a simple fee application consisting of nine pages of narrative, time records totaling forty-eight pages,[7] and ten pages of exhibits. Nine and one-half hours of paralegal time for the preparation of this pleading is unreasonable particularly in an experienced bankruptcy law firm.

■ This Court will not impose a per se rule regarding the amount of time attorneys should take to prepare fee applications. Nonetheless, the Court will always examine whether the preparation of the fee application is disproportionate to the total fees requested. Even if the Court found that the firm's services were appropriate legal services and reasonable under the standards set forth in 330(a), the firm's request for preparation of its fee application is disproportionate in this case. Considering the firm's experience in representing trustees, neither Mr. Slater nor his paralegal should have to reinvent the wheel for each and every fee application.

■ In sum, the Court first considered whether the work performed was for compensable legal services rather than work that should have been performed by the trustee. As noted above, the bulk of the firm's time entries showed that the work it performed should have been performed by the trustee because no unique difficulties requiring legal expertise arose in this case. Next, the Court examined the relevant factors under § 330(a) to determine whether the remaining requested compensation was reasonable. The Court is bound to allow compensation only for services that were necessary and benefit the estate. Having found none, the Court disallows the firm's request for compensation in its entirety, including costs under § 330(a)(1)(B). In short, the trustee did

---

7. Less than half of those pages had actual time entries; many pages contain only one entry.

not need to employ an attorney in this case.

## THE TRUSTEE'S FEE REQUEST

### F. STANDARDS FOR TRUSTEE COMPENSATION

Section 326(a) sets forth the maximum compensation available to a trustee as a commission (the "statutory cap"). The trustee requests as interim compensation, the maximum allowed under the statute or $3,050. The trustee documented 16.10 hours of time on this case, which includes an estimated 3.5 hours he will spend concluding the case. It does not include, however, the estimated 10.0 hours of staff time that will be spent in case closing and compliance with the Office of the United States Trustee. *See* Kipperman Fee App. 4:3 [Docket # 39].

■■■■ "The trustee has the burden of establishing that he is entitled to the fees requested." *In re Roderick Timber Co.*, 185 B.R. 601, 606 (9th Cir. BAP 1995) (citation omitted); *Columbia Plastics*, 251 B.R. at 584. " 'In order to receive compensation for services rendered and reimbursement of expenses, the trustee must file an application with the court.' " *Roderick Timber*, 185 B.R. at 606 (citations omitted). "The court must evaluate the sufficiency of the evidence provided by the trustee in support of the fee application and take into consideration whether the overall fee is reasonable under 11 U.S.C. § 330(a)." *Columbia Plastics*, 251 B.R. at 584.

■■■■ However, the court's allowance of reasonable compensation pursuant to § 330(a) is subject to the maximum commission calculated according to the formula set forth in § 326. This Court must

therefore first examine the factors set forth in § 330(a)(3) to determine whether the trustee is entitled to the statutory cap in this case.

### 1. Lack of Detailed Time Records

■■■ First, the Court notes that it is difficult to determine the reasonableness of the trustee's fee request because he documented only 16.10 hours of time.[8] The trustee states in his application that "it should be noted that given the nature of a trustee's duties, it is often difficult to maintain detailed time records." *See* Kipperman Fee App. 3:25–26 [Docket # 39]. Yet, the United States Trustee Manual for Chapter 7 Case Administration requires under section 2–2.81 that "the trustee should keep time records in every asset case as evidence of the services performed." *See also Roderick Timber*, 185 B.R. at 606. Further, as noted in *Roderick Timber*, if the "trustee was operating an ongoing business and attempting to reorganize the debtor, it [may] 'not be realistic to expect the trustee to prepare a time slip on each function that he perform[ed] during the day.' " *Id.* at 606 (citation omitted). But the trustee was not running a business in this case and, therefore, the Court finds that his argument regarding the lack of detail and his failure to record time is unpersuasive. "It has long been the rule in this circuit that trustees have a duty to meticulously maintain accurate records of time expended on behalf of the estate." *Id.* at 605 *citing Matter of Beverly Crest Convalescent Hosp., Inc.* 548 F.2d 817, 820 (9th Cir.1976).

### 2. Analysis of Section 330(a)(3) Factors

Section 330(a)(3) requests a court awarding trustee's fees to consider "the

---

8. The time sheets show a total of 16.10 hours with 3.50 hours estimated to attend the fee hearing, review and object to claims, prepare

reports for the UST, distribute funds and close the case.

nature, the extent, and the value of such services, taking into account all relevant factors, including–

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title."

One court noted:

[A]s implemented, these criteria for setting trustee fees have closely resembled the factors used for awarding attorney fees. In turn, those factors include the time and labor involved; the novelty and difficulty of the questions presented by the case; and the experience, reputation and ability of the professional.

*In re Borrego Springs Dev. Corp.*, 253 B.R. 271, 275 (S.D.Cal.2000) (citations omitted).

It is difficult to analyze some of the factors under § 330(a)(3) because the trustee kept minimal time records in this case. For example, under § 330(a)(3)(A) and (D) the Court can only look at the 16.10 hours documented by the trustee and find that his services were performed within a reasonable amount of time.

■ There is also no question that some of the trustee's services were necessary and benefited the estate under (C). The Court must conclude, however, that the services relating to the review of the firm's employment application (.50), reviewing and signing the conflict waiver (.20); review of the firm's invoices (1.5 hours), and telephone calls to Mr. Slater (.30) were neither necessary nor benefited the estate because the trustee did not need to hire an attorney in this case. The Court calculates that time in total to be 2.5 hours.

■ Problems also arise under subsections (B) and (E). The trustee billed his time at $375 per hour. *See* Tr. dated 9/30/04 50:3–4. Although the trustee may charge $375 an hour for his services in a non-bankruptcy setting, in evaluating the nature and extent of his services in this case, an hourly fee of $375 is unreasonable. The Court finds that an adjustment to the trustee's hourly rate is therefore appropriate.

The Court is aware that adjustments can work both ways. For example, one court noted:

A chapter 7 trustee does perform a variety of functions in his role, including investigating, liquidating, and distributing estate assets. Where the trustee has performed work that differs in complexity, a solution is to adjust his fee as a whole, to arrive at a 'blended' rate. We agree that the appropriate approach here was a unified rate for all of the trustee's services." *In re MiniScribe Corp.*, 309 F.3d 1234, 1244 (10th Cir. 2002) (citation omitted).

In *Miniscribe*, the trustee, as an attorney, charged $200 per hour. However, the trustee was awarded a rate of $400 per hour for his services because he had brought the highest levels of skill to the estate's administration and achieved outstanding results. The court noted that it was not evaluating the skill required of the attorney, but of the trustee, the fiduciary in the case. *See In re MiniScribe Corp.*,

257 B.R. 56, 62 (Bankr.D.Colo.2000); *See also Borrego Springs*, 253 B.R. at 277 (recognizing that the role of the trustee is different from that of the attorney and may be compensated differently).

The bankruptcy court in *MiniScribe Corp.*, upon remand from the district court regarding the trustee's hourly rate, aptly explained: "[The role] of the trustee is more difficult and more stressful than the role of legal counsel because it carries with it the burden of deciding how much is enough. The buck stops at the trustee's desk, not at the desk of legal counsel. He is entitled to some recognition for the nature of the position and the services provided in the role of trustee." *MiniScribe Corp.*, 257 B.R. at 62. The bankruptcy court also considered the fees charged by investment bankers, consultants, accountants and other professionals in the case to arrive at the hourly rate of $400 per hour for the trustee. *Id.*

Keeping these principles in mind, the trustee's time sheets show that most of the work he has documented was simple administrative trustee work, although he did spend approximately 1.4 hours participating in the firm's negotiations with the debtors' attorney and reviewing the title report.[9] As already observed, there was nothing complex about this case. The only asset was the debtors' home which was undervalued on the schedules. The trustee's services involved neither complex analysis regarding the investigation of assets nor multiparty negotiations which were required by the trustee in *MiniS-*

*cribe.* He did not run a business as a going-concern in order to sell it within a very short time frame such as the trustee in *Borrego Springs*.[10] With the exception of Dean Johnson, the trustee's accountant, there should not have been any other professionals involved in this case. Even so, the trustee requests an hourly rate much higher than Mr. Johnson, whose average billing rate was $80.45 per hour, and much higher than his attorneys whose average billing rate was $183.50 per hour.

Also bothersome to the Court is that the trustee's time sheets show at least seven entries in which the trustee reviewed the firm's invoices. Yet, the trustee never objected to the firm's billing of time for services related to its conflict with the Bank of America, nor did the trustee evidently recognize that the firm was performing most of the trustee's work.

■ Given the lack of novel or difficult issues in this case, the lack of detail in the trustee's time sheets and his failure to keep track of his services, and that the trustee's attorneys performed most of the trustee's duties, the Court finds a rate for the trustee's administrative services in this case should be $100 per hour, while a rate of $250 per hour is appropriate for his negotiations and review of the title report.[11] Although generally a court would use a unified blended hourly rate for all services, this is an easier case in which to identify the services which command a high hourly rate and those which command

---

9. See entries on 10/28/03; 11/5/03; 11/7/03; 11/13/03; and 11/24/03.

10. In *Borrego Springs*, 253 B.R. at 271, the debtor's principal asset was an 18–hole golf course and a residential estate totaling 3,140 acres. At the time of the bankruptcy filing, the estate had enough assets to sustain operations for only two more months. The trustee was able to maintain the value of the property

and sell it for $12.2 million without using a broker.

11. The Court wants to make perfectly clear that it is not establishing *a per se* rule regarding the hourly rates for Chapter 7 trustees in this District. Rather, as explained above, the hourly rates identified herein are unique to this case.

a more modest rate. *See MiniScribe*, 257 B.R. at 61. The Court also determines these rates based on its experience with fee petitions brought before this Court. *Compare Busy Beaver*, 19 F.3d at 853 (noting that a bankruptcy judge's experience with fee petitions and his or her expert judgment pertaining to appropriate billing practices will be the starting point for any analysis). Lastly, the *Busy Beaver* court noted: " '[a] Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn.' " *Id.* at 855 at n. 34 (citations omitted).

The trustee is therefore allowed $1570 (14.7 hours—2.5 hours (related to the firm and disallowed as unnecessary) = 12.2 hours × $100 = $1220 for administrative trustee work; 1.4 hours × $250 = $350 for negotiating and title review) as reasonable compensation pursuant to the standards set forth in § 330(a)(3). The statutory cap under § 326 is irrelevant.

### III.

### *CONCLUSION*

For the reasons noted above, the Court finds that the firm's request for compensation under § 330(a)(1) is denied in its entirety. The trustee is awarded compensation of $1570.

This Memorandum Decision constitutes findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. The Court has prepared an order in conformance with this Memorandum Decision.